## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No.: 20-cv-21530-DPG

| | |
|---|---|
| **MSP RECOVERY CLAIMS, SERIES LLC, MSP RECOVERY CLAIMS SERIES 44, LLC, MSPA CLAIMS 1, LLC, and SERIES PMPI, a designated series of MAO-MSO RECOVERY II, LLC,**<br><br>      **Plaintiffs,**<br>**v.**<br><br>**UNITED SERVICES AUTOMOBILE ASSOCIATION, USAA CASUALTY INSURANCE COMPANY, USAA GENERAL INDEMNITY COMPANY,**<br><br>      **Defendants.** | **CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

### PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

Plaintiffs, MSP Recovery Claims, Series LLC ("MSPRC"); MSP Recovery Claims Series 44, LLC ("Series 44"); MSPA Claims 1, LLC ("MSPAC"); and Series PMPI, a designated series of MAO-MSO Recovery II, LLC ("MAO-MSO") (collectively "Plaintiffs"), on behalf of themselves and all others similarly situated (the "Class Members"), bring this action against United Services Automobile Association, USAA Casualty Insurance Company, and USAA General Indemnity Company (collectively "Defendants"), and allege:

### **INTRODUCTION**

1.     Defendants have systematically and uniformly failed to honor their primary payer obligations under 42 U.S.C. § 1395y, otherwise known as the Medicare Secondary Payer Act (the

"MSP Act"), by failing to pay for or reimburse medical expenses resulting from injuries sustained in automobile and other accidents (the "accident-related medical expenses") that should have been paid by Defendants but, instead, were paid by Medicare Advantage ("MA") Plans.[1] Further, Defendants have also failed to reimburse Plaintiffs and the Class Members for accident-related medical expenses upon entering into settlements with Medicare beneficiaries. As a result, the cost of those accident-related medical expenses have been borne by Medicare and MA Plans to the detriment of the Medicare Trust Funds and the public.

2.      Defendants are auto or other liability insurers that issue "no-fault" coverage policies, which include Personal Injury Payments ("PIP") and Medical Payment Coverage policies to their insureds, including Medicare beneficiaries enrolled under Part C of the Medicare Act ("Enrollees"). Pursuant to their contractual obligations with their insureds, and under state law, Defendants are to provide coverage for their insureds' accident-related medical expenses on a "no-fault" basis (in other words, without regard for whether the insured was at fault for the accident). Defendants are also auto or other liability insurers that provide third-party liability insurance on behalf of their insureds, e.g. bodily injury coverage. In the case of automobile and other accidents specifically involving Enrollees of MA Plans, Defendants are considered primary plans under the MSP Act. *See* 42 U.S.C. § 1395y(b)(2)(A) (defining "primary plan" to include a group health plan or large group health plan … a workmen's compensation law or plan, an automobile or liability insurance policy or plan (including a self-insured plan) or no-fault insurance); 42 C.F.R. § 411.21 (same). Accordingly, Defendants' obligation to pay for accident-related medical expenses on

---

[1] As used herein, the term "MA Plans" collectively includes Medicare Advantage Organizations (those contracting directly with the Centers for Medicare & Medicaid Services ("CMS")), as well as first tier and downstream entities that ultimately paid for or provided accident-related medical expenses to Medicare beneficiaries, pursuant to risk-sharing agreements authorized under 42 U.S.C. § 1395w-22(b)(4).

behalf of Enrollees is primary relative to Medicare's obligation to pay for those same accident-related medical expenses, which is secondary. Defendants have failed to make and/or reimburse MA Plans for these payments, instead passing on those expenses to MA Plans.

3.      Plaintiffs' assignors are MA Plans that provide Medicare benefits under the Medicare Advantage Program, otherwise known as Part C of the Medicare Act. MA Plans provide such services pursuant to contracts with the Centers for Medicare & Medicaid Services ("CMS") in which CMS pays the MA Plans a fixed fee per enrollee and the MA Plans provide, at a minimum, the same benefits that Enrollees would receive under traditional Medicare. MA Plans stand on the same footing as traditional Medicare, including under the MSP Act, which declares that Medicare is a "secondary payer" to all other sources of coverage and, consequently, are empowered to recoup from rightful primary payers if they pay for services that fell within overlapping insurance maintained by Enrollees with a primary payer. *See MSPA Claims 1, LLC v. Tenet Florida, Inc.*, 918 F.3d 1312, 1316 (11th Cir. 2019); *Humana Medical Plan, Inc. v. Western Heritage Ins. Co.*, 832 F.3d 1229, 1237-39 (11th Cir. 2016).

4.      The overriding purpose of the MSP Act is to protect the Medicare Trust Fund by ensuring that Medicare and MA Plans do not pay for medical expenses that should be paid instead by primary payers such as Defendants.[2] Without the provisions in the MSP Act establishing a private right of action against primary payers, there would exist no mechanism to ensure that primary payers hold up their end of the bargain and pay the medical expenses associated with accident-related injuries and/or treatments. Therefore, Medicare and MA Plans, which are required to conditionally pay accident-related medical expenses promptly with the expectation of

---

[2] *See* Centers for Medicare and Medicaid Services, Coordination of Benefits and Recovery, Medicare Secondary Payer Overview (Jan. 13, 2014).

reimbursement from a primary payer, would unjustly bear the burden and the overwhelming expense of such injuries and treatments. The capitation payments made by CMS (from the Medicare Trust Fund) to MA Plans, which fund their risk contracts with down-stream providers, all come from the Medicare Trust Fund.

5.      In addition to their obligation to pay, and/or reimburse Medicare and MA Plans, for accident-related medical expenses, primary payers like Defendants have an affirmative burden, under applicable federal regulations promulgated under the MSP Act, to: (i) identify whether their insureds or claimants are Medicare beneficiaries; (ii) identify whether claimants with whom they enter into settlements are Medicare beneficiaries; and (iii) report their primary payer responsibility to CMS.

6.      Despite the MSP Act's clear legal requirement that primary payers like Defendants pay for accident-related medical expenses, take steps to identify whether their insureds, claimants, or claimants with whom they enter into settlements are Medicare beneficiaries, and report their primary payer responsibility to CMS,[3] primary payers often fail to honor their obligations and have, instead, taken steps to ensure that the burden for those accident-related medical expenses is borne by MA Plans. Even when primary payers report as required by law, they still often fail to pay or reimburse at the required industry standard rates.

7.      To remedy this problem, Congress provided a private right of action to any private entity or individual to enforce the MSP Act and remedy a primary payer's failure to reimburse conditional payments made by Medicare or MA Plans, and provided for the recovery of double damages for instances in which primary payers have failed to honor their payment and/or reimbursement obligations under the MSP Act.

---

[3] *Id.*

8.      As described in detail below, Plaintiffs' assignors and the Class Members have each suffered an injury-in-fact as a result of Defendants' failure to meet their statutory payment and reimbursement obligations. This lawsuit seeks to remedy that wrong and advance the interests of the MSP Act and Medicare, because when MA Plans recover conditional payments they "spend less on providing coverage for their enrollees" and the "Medicare Trust Fund . . . achieve[s] cost savings." *In re Avandia Mktg., Sales Practices & Products Liab. Litig.*, 685 F.3d 353, 365 (3d Cir. 2012).

## THE PARTIES[4]

9.      Plaintiff MSP Recovery Claims, Series LLC is a Delaware series limited liability company with a principal place of business located at 2701 S. Le Jeune Road, 10th Floor, Coral Gables, Florida 33134. MSPRC's Second Amendment of Limited Liability Company Agreement ("LLC Agreement") provides for the establishment of one or more designated series. All records of all series are maintained together with all assets of MSPRC. All designated series also have their principal place of business at 2701 S. Le Jeune Road, 10th Floor, Coral Gables, Florida

---

[4] The USAA company, like other large auto insurers, consists of numerous affiliated companies that offer different types of insurance across the country, complicating the identification of liable USAA defendants. Pursuant to Section 111, a Responsible Reporting Entity ("RRE") may not register as an RRE for a sibling in its corporate structure. An entity may register as an RRE for itself or for any direct subsidiary in its corporate structure. A parent entity may register as an RRE for any subsidiary in its corporate structure. Plaintiffs have made a good faith effort to be as precise as possible in their identification of Defendants and have relied on publicly available sources, including Defendants' website, annual filings, police crash and incident reports, and reporting data from Insurance Services Office ("ISO"), a third-party data analytics and compliance provider,  and a vendor called MyAbility. Through MyAbility, Plaintiffs have access to data that primary payers report to CMS in compliance with their statutory reporting obligations, and that data is attached to this Complaint. The data is inputted by Defendants, not Plaintiffs. Accordingly, any inaccuracies or lack of specificity in the reporting data is attributable to the manner in which Defendants chose to report. To the extent necessary, Plaintiffs will request minimal discovery as to the claims pled in this Complaint to ensure that Plaintiffs have identified the correct defendants.

33134.

10.     MSPRC has established various designated series pursuant to Delaware law in order to maintain various claims recovery assignments separate from other company assets, and to account for and associate certain assets with certain particular series. All designated series form a part of MSPRC and pursuant to MSPRC's LLC Agreement and applicable amendment(s), each designated series is owned and controlled by MSPRC. MSPRC may receive assignments in the name of MSPRC, and further associate such assignments with a particular series, or may have claims assigned directly to a particular series. In either event, pursuant to its LLC Agreement, any rights and benefits arising from assignments to its designated series shall belong to MSPRC, and MSPRC maintains the right to sue on behalf of each of its designated series and pursue any and all rights, benefits, and causes of action arising from assignments to a series:

> Without limiting the foregoing, the Company's purposes include owning and pursuing claims recovery and reimbursement rights assigned to the Company or any of its designated series, by Medicare Advantage Organizations … and other health care organizations or providers authorized by state or federal law … to pay for, provide or arrange for the provision of medical and health care services or supplies to persons, including but not limited to those who are covered under government healthcare programs such as Medicare, Medicare Advantage or Medicaid. The Company will own the assigned rights but may segregate the assignments by establishing series interests pursuant to Title 6, § 18-215 of the Delaware Code to serve as units of the Company. **For avoidance of doubt, the Company is authorized to pursue or assert any claim or suit capable of being asserted by any designated series arising from, or by virtue of, an assignment to a designated series.**

Section 2 of LLC Agreement (amending Section 2.3, entitled "Purpose," to include the language quoted above) (emphasis added). As such, MSPRC has the right and authority to seek reimbursement of Medicare payments made by the assignors that should have been paid by Defendants in the first instance.

6

11.     Any claim or suit may be brought by MSPRC in its own name or it may elect to bring suit in the name of its designated series.

12.     Plaintiff MSPA Claims 1, LLC is a Florida limited liability company, with its principal place of business at 2701 S. Le Jeune Road, Tenth Floor, Coral Gables, Florida 33134.

13.     Plaintiff MSP Recovery Claims Series 44, LLC is a Delaware series limited liability company with a principal place of business located at 2701 S. Le Jeune Road, 10th Floor, Coral Gables, Florida 33134. Series 44's Limited Liability Company Operating Agreement ("LLC Operating Agreement") provides for the establishment of one or more designated series. All designated series have their principal place of business at 2701 S. Le Jeune Road, 10th Floor in Coral Gables, Florida.

14.     Series 44 has also established various designated series pursuant to Delaware law in order to maintain various claims recovery assignments separate from other company assets, and to account for and associate certain assets with certain particular series. All designated series form a part of Series 44 and pursuant to Series 44's LLC Operating Agreement, each designated series is owned and controlled by Series 44. Series 44 may receive assignments in the name of Series 44, and further associate such assignments with a particular designated series or may have claims assigned directly to a particular designated series. In either event, pursuant to its LLC Operating Agreement, any rights and benefits arising from assignments to its designated series shall belong to Series 44, and Series 44 maintains the legal right to sue on behalf of each of its designated series and pursue any and all rights, benefits, and causes of action arising from assignments to a designated series:

> Without limiting the foregoing, the Company's purposes include owning and pursuing claims recovery and reimbursement rights assigned to the Company or any of its designated Series, by Medicare Advantage Organizations, health plans, Health

> Maintenance Organizations, Maintenance Service Organizations, Independent Practice Associations, and other health care organizations or providers authorized by state or federal law, or other administrative or licensing agencies, to pay for, provide or manage for the provision of medical and health care services or supplies to persons, including but not limited to those who are covered under government healthcare programs such as Medicare, Medicare Advantage, or Medicaid. The Company will own any such assigned rights but may segregate the assignments by establishing one or more Series pursuant to Section 18-215 of the Act to serve as units of the Company. **For the avoidance of doubt, the Company is authorized to pursue or assert any claim or suit capable of being asserted by any designated Series arising from, or by virtue of, an assignment to a designated Series.**

Section 2.3 of LLC Operating Agreement (emphasis added).

15.     As such, Series 44 has the right and authority to seek reimbursement of Medicare payments made by its designated series' assignors that should have been paid by Defendants in the first instance.

16.     Any claim or suit may be brought by Series 44 in its own name or it may elect to bring suit in the name of its designated series.

17.     Plaintiff Series PMPI, a designated series of MAO-MSO Recovery II, LLC, is a Delaware limited liability company with its principal place of business at 45 Legion Drive, Cresskill, New Jersey 07626.

18.     Defendant United Services Automobile Association is a company that issues liability and no-fault policies, with its principal place of business at 9800 Fredericksburg Road, San Antonio, Texas 78288.

19.     Defendant USAA Casualty Insurance Company is a company that issues liability and no-fault policies, with its principal place of business at 9800 Fredericksburg Road, San Antonio, Texas 78288.

20.     Defendant USAA General Indemnity Company is a company that issues liability

and no-fault policies, with its principal place of business at 9800 Fredericksburg Road, San Antonio, Texas 78288.

<strong>ASSIGNMENTS</strong>

21.     Plaintiffs have been assigned all legal rights of recovery and reimbursement for medical items and services provided by assignors that administer Medicare benefits for Medicare beneficiaries under Medicare Part C, whether said rights arise from: (i) contractual agreements, such as participation and network agreements with capitation and risk sharing arrangements, and/or (ii) state and federal laws that provide for the reimbursement of payments made by the assignor health plans, including the right to recover claims for health care services on a fee-for-service basis.

22.     Plaintiffs' assignors have assigned all rights, title, and interest to the recoverable claims, conferring standing to Plaintiffs to bring this lawsuit. The assignments are valid and binding contracts.

23.     Plaintiffs' assignors paid for the unreimbursed medical items and services related to the treatment of injuries arising from an accident and/or incident for which Defendants were responsible as the primary payer.

<strong><em><u>Plaintiff MSPRC's Standing</u></em></strong>

24.     Certain designated series of Plaintiff MSPRC have been irrevocably assigned any and all rights to recover payments made on behalf of their assignors' health plan members and Enrollees. These assignments authorize the designated series, and in turn Plaintiff MSPRC through its LLC Agreement, to pursue and enforce all legal rights of recovery and reimbursement for health care services and Medicare benefits.

25.     The assignments to Plaintiff MSPRC, which are alleged in Appendix 2 to this

Complaint, are valid and binding contracts.

### *Plaintiff MSPAC's Standing*

26.    Plaintiff MSPAC has been irrevocably assigned any and all rights to recover payments made on behalf of its assignors' health plan members and Enrollees. These assignments authorize MSPAC to pursue and enforce all legal rights of recovery and reimbursement for health care services and Medicare benefits.

27.    The assignment to Plaintiff MSPAC, which is alleged in detail in Appendix 2 to this Complaint, is a valid and binding contract.

### *Plaintiff Series 44's Standing*

28.    Certain designated series of Plaintiff Series 44 have been irrevocably assigned any and all rights to recover payments made on behalf of their assignors' health plan members and Enrollees. These assignments authorize the designated series, and in turn Plaintiff Series 44 through its LLC Operating Agreement, to pursue and enforce all legal rights of recovery and reimbursement for health care services and Medicare benefits.

29.    The assignments to Plaintiff Series 44, which are alleged in Appendix 2 to this Complaint, are valid and binding contracts.

### *Plaintiff MAO-MSO's Standing*

30.    Plaintiff MAO-MSO has been irrevocably assigned any and all rights to recover payments made on behalf of its Assignors' health plan members and Enrollees. These assignments authorize MAO-MSO to pursue and enforce all legal rights of recovery and reimbursement for health care services and Medicare benefits.

31.    The assignment to Plaintiff MAO-MSO, which is alleged in detail in Appendix 2 to this Complaint, is a valid and binding contract.

*Additional Standing Allegations*

32.     Further, and separately, approximately three of the assignment agreements held by the individual Plaintiffs contain exclusionary language, often referred to as "carve-out" provisions. Under those provisions, a limited number of claims were retained by the applicable assignor.

33.     In all instances where an assignment contains a carve-out provision, the assignor has furnished Plaintiffs with one or more itemized lists identifying the specific claims retained by that assignor. Those lists are referred to as "carve-out lists." Plaintiffs have cross-referenced the individual exemplar claims alleged herein against the respective carve-out lists and confirmed that the exemplar claims: (1) do not appear on the carve-out lists, and (2) have been assigned and conveyed to one of the Plaintiffs in this case.

34.     Put differently, the exemplar claims alleged herein have not been assigned or conveyed to any other recovery vendor (outside of the chain of assignments detailed herein) and were not being pursued by any other recovery vendor (by subrogation action or otherwise) at the time the underlying assignment agreements were executed and/or made effective. The exemplar claims have been assigned to Plaintiffs pursuant to certain of the assignment agreements detailed in Appendix 2.

## JURISDICTION AND VENUE

35.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(d). At least one member of the class is a citizen of a different state than Defendants and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interests and costs.

36.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331.

37.     This court has personal jurisdiction over Defendants under Florida Statutes Section

48.193 because Defendants: (a) have contracted to insure a person, property, or risk located within this state at the time of contracting; and (b) operate, conduct, and carry on business ventures in the State of Florida. *See* Fla Stat. § 48.193(1)(a)(1), (1)(a)(4). This Court also has personal jurisdiction over Defendants under Florida Statute Section 48.193(1)(a)(2) for having committed a tortious act within this State, that is, Defendants' violations of the MSP Act. As set forth in greater detail below, the exemplar claims demonstrate that Defendants conduct business within this state. Defendants' have failed to reimburse Plaintiffs' Florida-based assignors and have failed to reimburse Plaintiffs' assignors for treatments rendered by Florida-based providers to Enrollees located or residing in the State of Florida or both.

38.     Further, Defendants maintain sufficient minimum contacts with the State of Florida so as to not offend traditional notions of fair play and substantial justice. Defendants maintain and carry on systematic and continuous contacts in this judicial district, regularly transact business within this judicial district, and regularly avail themselves of the benefits in this judicial district. Defendants have purposefully availed themselves of the privilege of conducting activities within the State of Florida, thus invoking the benefits and protections of its laws. Defendants' purposeful availment was such that they should have reasonably anticipated being haled into court in this forum.

39.     At all times herein mentioned, Defendants were authorized to do or otherwise engage in business within the State of Florida and did in fact offer insurance policies that contain no-fault and/or medical payments ("Med Pay") coverage for any accident-related medical expense within the State of Florida and elsewhere. Defendants are registered with Florida's Division of Corporation to transact business within the State of Florida and are licensed to underwrite insurance policies in the State of Florida.

40.     Exercising personal jurisdiction over Defendants does not offend traditional notions of fair play and substantial justice.

41.     A substantial part of the events and omissions giving rise to Plaintiffs' causes of action occurred in this federal judicial district.

42.     Venue is proper under 28 U.S.C. § 1391 in the United States District Court for the Southern District of Florida because it is the district in which the cause of action accrued.

## GENERAL ALLEGATIONS

43.     This is a class action lawsuit under the MSP Act, arising from Defendants' failure to reimburse conditional payments made by Plaintiffs' assignors and the Class Members on behalf of Enrollees for accident-related medical expenses.

44.     Defendants' liability to reimburse such conditional payments arises in one of two contexts: (i) where Defendants are obligated to pay for Enrollees' accident-related medical expenses in the first instance under a no-fault policy; or (ii) where Defendants have entered into settlement agreements with Enrollees as a result of claims arising under liability insurance policies[5] issued by Defendants.

45.     On behalf of themselves and the Class Members, Plaintiffs seek, *inter alia*, double damages under the MSP Act's private cause of action for Defendants' failure to properly reimburse Plaintiffs' assignors' and the Class Members' conditional payments for Enrollees' accident-related medical expenses.

46.     Defendants have failed to fulfill statutory duties as primary payers. Specifically, Plaintiffs' data and certain other information obtained from third parties demonstrates that

---

[5] Liability insurance plans are considered primary plans under 42 U.S.C. § 1395y(b)(2). They include third-policy policies that provide for bodily injury coverage, uninsured motorist coverage, underinsured motorist coverage, umbrella coverage, and commercial coverage.

Defendants have repeatedly failed to pay or reimburse conditional payments by Plaintiffs' assignors and Class Members on behalf of Enrollees for accident-related medical expenses. Enrollees are Medicare beneficiaries who were enrolled in an MA Plan offered or managed by Plaintiffs' assignors and Class Members. Plaintiffs' assignors and the Class Members suffered an injury-in-fact from Defendants' failure to reimburse accident-related conditional payments, and accordingly have standing to sue under 42 U.S.C. §1395y(b)(3)(A).

47.     Plaintiffs' assignors and the putative Class Members provided Medicare benefits to the Enrollees. In numerous instances, Enrollees suffered injuries in connection with an accident, and Plaintiffs' assignors and the putative Class Members paid for accident-related medical expenses.[6] Because Enrollees were also covered by no-fault policies issued by Defendants, Defendants are primary payers under the MSP Act and either should have directly paid the accident-related medical expenses directly or reimbursed Plaintiffs' assignors and the putative Class Members for the conditional payments they made, but have failed to do so.

48.     Defendants have also failed to fulfill their statutory duties as primary payers upon entering into settlements with Enrollees. Upon information and belief, Defendants have entered into settlement agreements with Enrollees as a result of claims arising under liability insurance policies issued by Defendants. Accordingly, Defendants are primary payers under the MSP Act and either should have directly paid the Enrollees' accident-related medical expenses or reimbursed Plaintiffs' assignors and the putative Class Members for the conditional payments they

---

[6] MA Plans are required to promptly pay "clean claims" for medical expenses presented by healthcare providers so that Medicare beneficiaries are not faced with the burden of having to pay such expenses with the hopes of being reimbursed by a primary payer like Defendants. MA Plans cannot reasonably expect that a primary payer is liable for such expenses and/or will pay such expenses in a prompt fashion. Accordingly, any payments made by MA Plans, and Medicare for that matter, for accident-related medical expenses are conditional payments subject to reimbursement by a responsible primary payer.

made, but have failed to do so.

49.     The MSP Act does not require MA Plans to file a claim with or give notice to a primary payer, such as Defendants, as a condition to seeking reimbursement of conditional payments. *See MSP Recovery Claims, Series LLC v. Ace Am. Ins. Co.*, 974 F.3d 1305, 1319 (11th Cir. 2020); *MSPA Claims 1, LLC v. Kingsway Amigo Ins. Co.*, 950 F.3d 764 (11th Cir. 2020).

50.     Rather than honor their obligations under the MSP Act, Defendants' actions and omission result in a failure to pay or reimburse the accident-related medical expenses paid by Plaintiffs' assignors and the Class Members on behalf of Enrollees. These steps include failing to report their primary payer responsibility to CMS and failing to coordinate benefits[7] with MA Plans, including with Plaintiffs on behalf of Plaintiffs' assignors.[8]

51.     Upon information and belief, Defendants have failed to report their primary payer responsibility and failed to pay and/or reimburse one or more of the conditional payments made by Plaintiffs' assignors for accident-related medical expenses on behalf of Plaintiffs' assignors' Enrollees, for which Defendants have a demonstrated responsibility to pay under the MSP Act. Upon information and belief, this underreporting and misreporting to CMS regarding payments and beneficiaries is widespread and a product of Defendants' systemic failures to investigate and obtain information required to determine a claimant's Medicare eligibility or enrollment in an MA

---

[7] *See* Centers for Medicare and Medicaid Services, Coordination of Benefits and Recovery, Medicare Secondary Payer Overview (Jan. 13, 2014).

[8] Prior to the filing of this lawsuit, Plaintiffs sent correspondence seeking to coordinate benefits with Defendant, as contemplated under 42 C.F.R. § 411.25. Defendants' counsel responded and expressly rejected Plaintiffs' efforts to coordinate benefits. That is, Defendants refused to "provide notice [to Plaintiffs] about [their] primary payment responsibility and information about the underlying MSP situation[.]" 42 C.F.R. § 411.25(a). Further, Defendants refused to "describe the specific situation and the circumstances (including the particular type of insurance coverage as specified in §411.20(a)) and, if appropriate, the time period during which [Defendants were] primary to [Plaintiffs]." 42 C.F.R. § 411.25(b).

Plan, or whether accident-related conditional payments have been made on the claimant's behalf.

52.     As described in detail herein, Plaintiffs' assignors and the Class Members have each suffered an injury-in-fact as a result of Defendants' failure to meet their statutory payment and reimbursement obligations. This lawsuit seeks to remedy that wrong and advance the interests of the MSP Act and Medicare, because when MA Plans recover conditional payments, they "spend less on providing coverage for their enrollees" and the "Medicare Trust Fund . . . achieve[s] cost savings." *Avandia*, 685 F.3d at 365. In fact, as explained by the Department of Health and Human Services, which administers the Medicare program and recently submitted an amicus brief to the Eleventh Circuit Court of Appeals in the *Ace* case, "payment[s] by primary payers reduce[] costs, and some of those savings are passed on to Medicare through reduced costs or to the beneficiaries through expanded services." *See MSP Recovery Claims, Series LLC v. Ace Am. Ins. Co.*, Case No. 18-12139, U.S. Court of Appeals, Eleventh Circuit, Brief for the United States as Amicus Curiae at 11.

53.     Using the proprietary system designed and developed by Plaintiffs' related entity, MSP Recovery, LLC (the "MSP System"), Plaintiffs can capture, compile, synthesize, and funnel large amounts of data, which data is kept in the standard format for storing digital health insurance claims data, or electronic data interchange ("EDI"), called 837P ("837"),[9] to identify claims where Defendants have failed to honor their primary payer responsibilities on a class-wide basis.

54.     The MSP System utilizes ICD-9-CM or ICD-10-CM medical diagnosis codes and DRGs, ICD-9, ICD-10 PCS, HCPCS, or CPT procedure codes to gather information regarding an

---

[9] A detailed explanation of CMS' standard for storing digital health insurance claims data is set forth in Appendix 1 to this Complaint. *See also* Centers for Medicare and Medicaid Services, Medicare Learning Network, Medicare Billing: Form CMS-1500 and the 837 Professional (July 2019), *available at* https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/Downloads/837P-CMS-1500.pdf.

Enrollee's claim, such as the type of injury suffered, the circumstances that caused the injury, whether the listed primary insurance provider made payment, and whether the insurance carrier was a liability provider.

55. The MSP System captures data from different sources, including CMS, ISO and publicly available police crash and incident reports, to identify unreimbursed conditional payments made by Plaintiffs' assignors for their Enrollees' accident-related medical expenses for which Defendants are responsible as the primary payer.

56. The MSP System can also identify the amounts owed, through a data matching process using Plaintiffs' assignors' EDI, Class Members' EDI and Defendants' EDI, to discover and identify unreimbursed conditional payments made by Plaintiffs' assignors for accident-related medical expenses on behalf of their Enrollees for which Defendants are responsible as the primary payer. This data matching process can also be applied class-wide by matching Defendants' EDI with the Class Members' EDI to identify unreimbursed conditional payments made by the Class Members for accident-related medical expenses on behalf of their Enrollees for which Defendants are responsible.

57. Using the MSP System, Plaintiffs have identified multiple instances in which Plaintiffs' assignors made conditional payments for accident-related medical expenses which should have been paid and/or reimbursed by Defendants. Plaintiffs describe a number of those instances in detail below, and attached as Exhibit A are instances where Defendants admitted, by reporting to CMS, that they were obligated (pursuant to no-fault and other liability policies) to provide primary payment on behalf of Enrollees for conditional payments made by Plaintiffs' assignors.

58. For Exhibit A, in every instance, one of Plaintiff's assignors made payments on

behalf of the identified Enrollee for whom one of the Defendants reported and admitted its primary payer responsibility. The data columns of Exhibit A identify the Enrollee's full name ("Msp Memb Full Name"), the assignor health plan for the Enrollee ("Assignor"), the date of loss as reported by Defendants to CMS ("Enrollment Date"), the primary "plan name" as reported by Defendants to CMS ("Reporting Primary Payer"), the primary plan contract or policy number as reported by Defendants to CMS ("Contract / Plan #"), and the type of policy under which the underlying claim was submitted ("Insurance Type").[10]

59.    In those instances where Defendants reported themselves responsible pursuant to "no-fault" policies, they did so as a result of contractual obligations to the Enrollee at issue.

60.    And in those instances where Defendants reported themselves as responsible pursuant to liability policies, they did so as a result of entering into settlement agreements with the corresponding Enrollees. Minimal discovery is needed to fully identify the full scope of claims, beneficiareies, amounts, and assignors in this case and, as noted above, can be accomplished through an exchange of data, similar to what already is occurring in numerous similar matters in this and other federal district courts.

61.    By virtue of Defendants' own actions, insurance contracts, settlements, and reporting pursuant to 42 U.S.C. § 1395y(b)(7)-(9), Defendants had actual and constructive knowledge of their primary payer obligations to Plaintiffs' assignors, the Class Members, and the entire Medicare Advantage system, specifically that they were responsible to reimburse Plaintiffs' assignors and the Class Members for accident-related expenses.

---

[10] Additional information regarding the claimants identified on Exhibit A will be provided directly to Defendants pursuant to the Stipulated Protective Order (ECF No. 74). That information has been reserved to protect from public disclosure confidential Protected Health Information ("PHI") in accordance with the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").

62.     What is listed in Exhibit A are instances where Defendants have attempted to meet their duties to report pursuant to 42 U.S.C. § 1395y(b)(7)-(9), but nevertheless failed to reimburse Plaintiffs' assignors. Further, in violation of federal law, auto and liability insurers do not report all of their claims. The full extent of Defendants' liability on unreported claims can only be known through the data matching process described above, which is underway in a number of other matters.

63.     Confirming Defendants' failures to report, Plaintiffs have identified instances where Defendants are identified in police crash and incident reports[11] as the insurer contractually obligated (pursuant to no-fault or other liability policies) to provide primary payment on behalf of Enrollees for unreimbursed conditional payments made by Plaintiffs' assignors in connection with accident-related medical expenses, but failed to report that primary payer responsibility to CMS. Those instances are listed on Exhibit B.

64.     Plaintiffs' assignors and the Class Members have each suffered an injury-in-fact as a result of Defendants' failure to meet their statutory payment and reimbursement obligations, including Defendants entering into settlements with Enrollees. To illustrate the types of claims at issue, and to remove any doubt as to Plaintiffs' standing, Plaintiffs have identified examples below in which Plaintiffs' assignors made conditional payments for accident-related medical expenses which should have been reimbursed by the Defendants.

65.     Each of the exemplar claims set forth herein has been assigned to one of the Plaintiffs. The claims are not subject to any carveouts, exclusions, or any other limitations in law

---

[11] Police crash and incident reports are only publicly available in a handful of jurisdictions, including Connecticut, Florida, Georgia, Ohio and Texas.

or equity that would impair Plaintiffs' right to recover these claims.[12]

66.     The allegations set forth herein plainly demonstrate that Plaintiffs' assignors suffered damages as a direct result of Defendants' failure to reimburse conditional payments as required under the MSP Act.

67.     In addition, Section 1395y(a)(1)(A) of the Medicare statute states that, "no payment may be made under [the Medicare statute] for any expenses incurred for items or services which ... are not reasonable and necessary for the diagnosis or treatment of illness or injury."

68.     Because this section contains an express condition of payment – that is, "no payment may be made" – it explicitly classifies each Medicare payment for a particular item or service as "reasonable and necessary."

69.     Once an MA Plan makes a payment for medical items and services on behalf of its enrollees, the payment is conclusive proof that the items and services were reasonable and necessary.

70.     The items and services received by and paid on behalf of Plaintiffs' assignors' Enrollees, including the exemplar claims below, were reasonable and necessary to treat the injuries suffered by each Enrollee.

71.     Plaintiffs set forth the exemplars below to illustrate Defendants' failure to fulfill their statutory duties as "no-fault" and/or other liability insurers. Defendants have reported and admitted their primary payer status and responsibility for the accident-related medical expenses for medical items and/or services provided to the exemplar claims and for which Plaintiffs' assignors made conditional payments.

---

[12] Plaintiffs' process for confirming that exemplar claims are not excluded from the assigned claims is alleged in detail in Appendix 2 of this Complaint.

### The No-Fault Claims Illustrating Standing[13]

*The D.C. Claim Demonstrates MSPRC's Right to Recover for Defendants' Failure to Meet their Reimbursement Obligations under the MSP Act*

72.     On February 22, 2018, D.C. was injured in an accident. As a direct and proximate result of the accident, D.C. sustained injuries that required medical items and services.

73.     At the time of the accident, D.C.'s accident-related medical costs and expenses were covered under a no-fault policy issued by Defendant USAA Casualty Insurance Company under policy number 001394703 or 001394703C71011.[14] By virtue of its no-fault policy, Defendant USAA Casualty Insurance Company was contractually obligated to pay and provide primary coverage for D.C.'s accident-related medical expenses.

74.     At the time of the accident and on the dates the accident-related medical treatment was rendered to D.C., D.C. was enrolled in an MA Plan issued and administered by AvMed, Inc. ("AvMed") pursuant to CMS Contract ID Number H1016.[15] AvMed is an MA Plan.

75.     A list of D.C.'s diagnosis codes and injuries in connection with D.C.'s accident-related treatment is attached hereto as Exhibit C.

76.     D.C.'s accident-related medical services were rendered on February 22, 2018. The medical provider subsequently issued to AvMed bills for payment of D.C.'s accident-related medical expenses.

---

[13] In the case of each exemplar no-fault claim, the no-fault policy information required to further confirm the responsible underwrither is in Defendants' possession, custody, and control. Plaintiffs reserve the right to amend their allegations if the no-fault policies show that Defendants' generic reporting practices did not disclose the responsible underwriter.

[14] Plaintiffs are unable to allege with certainty the no-fault policy number covering this accident because different policy numbers were identified in the Section 111 reporting data obtained from MyAbility and the Florida Traffic Crash Report.

[15] AvMed only operates under CMS Contract ID Number H1016.

77.     The medical provider billed and charged AvMed $762.00 for D.C.'s accident-related medical expenses, of which AvMed paid $330.00 on March 26, 2018.

78.     By virtue of a no-fault policy which covered D.C. for the accident-related medical expenses detailed herein, Defendant USAA Casualty Insurance Companyis a primary payer responsible for payment and/or reimbursement of D.C.'s accident-related medical expenses.

79.     Defendant USAA Casualty Insurance Companyreported to CMS information regarding the accident, the name of the reporting entity, and the type of insurance policy involved, and admitted its primary payer status related to payment and/or reimbursement of D.C.'s accident-related medical expenses. Defendant reported responsibility under "United Services Automobile Assoc," but because of Defendant's imprecise reporting, Plaintiffs cannot confirm the insurer for this claimant.[16]

80.     This reporting demonstrates that Defendant was aware of the accident and its responsibility to reimburse AvMed. Despite reporting that it was a primary payer, and the corresponding admission that it should have paid for D.C.'s accident-related injuries in the first instance, Defendant USAA Casualty Insurance Companyfailed to reimburse such payments, giving rise to a claim under the MSP Act.

81.     The D.C. claim was assigned to MSPRC and is not an excluded claim under any of the assignment's carveouts because: (1) the claim is not asserted against one of AvMed's network healthcare providers or current or former members, and (2) the claim does not arise from or relate to GlaxoSmithKline's manufacturing facility in Cidra, Puerto Rico.

---

[16] Plaintiffs' identification of USAA Casualty Insurance Company as the responsible primary payer is based on the no-fault insurer identified in the Florida Traffic Crash Report. If Plaintiffs have identified the incorrect USAA affiliate, Plaintiffs reserve the right to amend this allegation to add the correct defendant.

82.     Accordingly, MSPRC is entitled to recover double the amount billed for D.C.'s accident-related medical expenses.

### *The G.P. Claim Demonstrates MSPRC's Right to Recover for Defendants' Failure to Meet their Reimbursement Obligations under the MSP Act*

83.     On September 23, 2018, G.P. was injured in an accident. As a direct and proximate result of the accident, G.P. sustained injuries that required medical items and services.

84.     At the time of the accident, G.P.'s accident-related medical costs and expenses were covered under a no-fault policy issued by Defendant USAA Casualty Insurance Company under policy number 011681943 or 011681943C71014.[17] By virtue of its no-fault policy, Defendant USAA Casualty Insurance Company was contractually obligated to pay and provide primary coverage for G.P.'s accident-related medical expenses.

85.     At the time of the accident and on the dates the accident-related medical treatment was rendered to G.P., G.P. was enrolled in an MA Plan issued and administered by AvMed pursuant to CMS Contract ID Number H1016.

86.     A list of G.P.'s diagnosis codes and injuries in connection with G.P.'s accident-related treatment is attached hereto as Exhibit D.

87.     G.P.'s accident-related medical services were rendered on September 23, 2018. The medical providers subsequently issued to AvMed bills for payment of G.P.'s accident-related medical expenses.

88.     The medical providers billed and charged AvMed $14,063.00 for G.P.'s accident-related medical expenses, of which AvMed paid $6,172.35 between October 1, 2018 and July 22,

---

[17] Plaintiffs are unable to allege with certainty the no-fault policy number covering this accident because different policy numbers were identified in the Section 111 reporting data obtained from MyAbility and the Florida Traffic Crash Report.

2019.

89.     By virtue of a no-fault policy which covered G.P. for the accident-related medical expenses detailed herein, Defendant USAA Casualty Insurance Company is a primary payer responsible for payment and/or reimbursement of G.P.'s accident-related medical expenses.

90.     Defendant USAA Casualty Insurance Company reported to CMS information regarding the accident, the name of the reporting entity, and the type of insurance policy involved, and admitted its primary payer status related to payment and/or reimbursement of G.P.'s accident-related medical expenses. Defendant reported responsibility under "United Services Automobile Assoc," but because of Defendant's imprecise reporting, Plaintiffs cannot confirm the insurer for this claimant.[18]

91.     This reporting demonstrates that Defendant was aware of the accident and its responsibility to reimburse AvMed. Despite reporting that it was a primary payer, and the corresponding admission that it should have paid for G.P.'s accident-related injuries in the first instance, Defendant USAA Casualty Insurance Company failed to remit and/or reimburse such payments, giving rise to a claim under the MSP Act.

92.     The G.P. claim was assigned to MSPRC and is not an excluded claim under any of the assignment's carve-outs because: (1) the claim is not asserted against one of AvMed's network healthcare providers or current or former members, and (2) the claim does not arise from or relate to GlaxoSmithKline's manufacturing facility in Cidra, Puerto Rico.

93.     Accordingly, MSPRC is entitled to recover double the amount billed for G.P.'s

---

[18] Plaintiffs' identification of USAA Casualty Insurance Company as the responsible primary payer is based on the no-fault insurer identified in the Florida Traffic Crash Report. If Plaintiffs have identified the incorrect USAA affiliate, Plaintiffs reserve the right to amend this allegation to add the correct defendant.

accident-related medical expenses.

> ### *The J.C. Claim Demonstrates MSPRC's Right to Recover for Defendants' Failure to Meet their Reimbursement Obligations under the MSP Act*

94.     On February 22, 2018, J.C. was injured in an accident. As a direct and proximate result of the accident, J.C. sustained injuries that required medical items and services.

95.     At the time of the accident, J.C.'s accident-related medical costs and expenses were covered under a no-fault policy issued by Defendant USAA Casualty Insurance Company under policy number 001394703 and 001394703C71011.[19] By virtue of its no-fault policy, Defendant USAA Casualty Insurance Company was contractually obligated to pay and provide primary coverage for J.C.'s accident-related medical expenses.

96.     At the time of the accident and on the dates the accident-related medical treatment was rendered to J.C., J.C. was enrolled in an MA Plan issued and administered by Avmed pursuant to CMS Contract ID Number H1016.

97.     A list of J.C.'s diagnosis codes and injuries in connection with J.C.'s accident-related treatment is attached hereto as Exhibit E.

98.     J.C.'s accident-related medical services were rendered between February 22, 2018 and April 23, 2018. The medical providers subsequently issued to AvMed bills for payment of J.C.'s accident-related medical expenses.

99.     The medical providers billed and charged AvMed $2,955.48 for J.C.'s accident-related medical expenses, of which AvMed paid $867.45 between March 5, 2018 and May 21, 2018.

---

[19] Plaintiffs are unable to allege with certainty the no-fault policy number covering this accident because different policy numbers were identified in the Section 111 reporting data obtained from MyAbility and the Florida Traffic Crash Report.

100.    By virtue of a no-fault policy which covered J.C. for the accident-related medical expenses detailed herein, Defendant USAA Casualty Insurance Company is a primary payer responsible for payment and/or reimbursement of J.C.'s accident-related medical expenses.

101.    Defendant USAA Casualty Insurance Company reported to CMS information regarding the accident, the name of the reporting entity, and the type of insurance policy involved, and admitted its primary payer status related to payment and/or reimbursement of J.C.'s accident-related medical expenses. Defendant reported responsibility under "United Services Automobile Assoc," but because of Defendant's imprecise reporting, Plaintiffs cannot confirm the insurer for this claimant.[20]

102.    This reporting demonstrates that Defendant was aware of the accident and its responsibility to reimburse AvMed. Despite reporting that it was a primary payer, and the corresponding admission that it should have paid for J.C.'s accident-related injuries in the first instance, Defendant USAA Casualty Insurance Company failed to reimburse such payments, giving rise to a claim under the MSP Act.

103.    The J.C. claim was assigned to MSPRC and is not an excluded claim under any of the assignment's carve-outs because: (1) the claim is not asserted against one of AvMed's network healthcare providers or current or former members, and (2) the claim does not arise from or relate to GlaxoSmithKline's manufacturing facility in Cidra, Puerto Rico.

104.    Accordingly, MSPRC is entitled to recover double the amount billed for J.C.'s accident-related medical expenses.

---

[20] Plaintiffs' identification of USAA Casualty Insurance Company as the responsible primary payer is based on the no-fault insurer identified in the Florida Traffic Crash Report. If Plaintiffs have identified the incorrect USAA affiliate, Plaintiffs reserve the right to amend this allegation to add the correct defendant.

*The V.S. Claim Demonstrates MSPRC's Right to Recover for Defendants'
Failure to Meet their Reimbursement Obligations under the MSP Act*

105.    On June 25, 2017, V.S. was injured in an accident. As a direct and proximate result of the accident, V.S. sustained injuries that required medical items and services.

106.    At the time of the accident, V.S.'s accident-related medical costs and expenses were covered under a no-fault policy issued by Defendant USAA General Indemnity Company under policy number 036180149 or 036180149G71021.[21] By virtue of the no-fault policy, Defendant USAA General Indemnity Company was contractually obligated to pay and provide primary coverage for V.S.'s accident-related medical expenses.

107.    At the time of the accident and on the dates the accident-related medical treatment was rendered to V.S., V.S. was enrolled in an MA Plan issued and administered by AvMed pursuant to CMS Contract ID Number H1016.

108.    A list of V.S.'s diagnosis codes and injuries in connection with V.S.'s accident-related treatment is attached hereto as Exhibit F.

109.    V.S.'s accident-related medical services were rendered between June 25, 2017 and August 14, 2017. The medical providers subsequently issued to AvMed bills for payment of V.S.'s accident-related medical expenses.

110.    The medical providers billed and charged AvMed $6,848.85 for V.S.'s accident-related medical expenses, of which AvMed paid $5,503.13 between July 10, 2017 and January 15, 2018.

111.    By virtue of a no-fault policy which covered V.S. for the accident-related medical

---

[21] Plaintiffs are unable to allege with certainty the no-fault policy number covering this accident because different policy numbers were identified in the Section 111 reporting data obtained from MyAbility and the Florida Traffic Crash Report.

expenses detailed herein, Defendant USAA General Indemnity Company is a primary payer responsible for payment and/or reimbursement of V.S.'s accident-related medical expenses.

112.    Defendant USAA General Indemnity Company reported to CMS information regarding the accident, the name of the reporting entity, and the type of insurance policy involved, and admitted its primary payer status related to payment and/or reimbursement of V.S.'s accident-related medical expenses. Defendant reported responsibility under "United Services Automobile Assoc," but because of Defendant's imprecise reporting, Plaintiffs cannot confirm the insurer for this claimant.[22]

113.    This reporting demonstrates that Defendants were aware of the accident and their responsibility to reimburse AvMed. Despite reporting that it was a primary payer, and the corresponding admission that it should have paid for V.S.'s accident-related injuries in the first instance, Defendant USAA General Indemnity Company failed to reimburse such payments, giving rise to a claim under the MSP Act.

114.    The V.S. claim was assigned to MSPRC and is not an excluded claim under any of the assignment's carve-outs because: (1) the claim is not asserted against one of AvMed's network healthcare providers or current or former members, and (2) the claim does not arise from or relate to GlaxoSmithKline's manufacturing facility in Cidra, Puerto Rico.

115.    Accordingly, MSPRC is entitled to recover double the amount billed for V.S.'s accident-related medical expenses.

---

[22] Plaintiffs' identification of USAA General Indemnity Company as the responsible primary payer is based on the no-fault insurer identified in the Florida Traffic Crash Report. If Plaintiffs have identified the incorrect USAA affiliate, Plaintiffs reserve the right to amend this allegation to add the correct defendant.

*The C.C. Claim Demonstrates MSPAC's Right to Recover for Defendants' Failure to Meet their Reimbursement Obligations under the MSP Act*

116.    On July 3, 2013, C.C. was injured in an accident. As a direct and proximate result of the accident, C.C. sustained injuries that required medical items and services.

117.    At the time of the accident, C.C.'s accident-related medical costs and expenses were covered under a no-fault policy issued by Defendant USAA Casualty Insurance Company under policy number 017109426, 017109426010 or 017109426C.[23] By virtue of the no-fault policy, Defendant USAA Casualty Insurance Company was contractually obligated to pay and provide primary coverage for C.C.'s accident-related medical expenses.

118.    At the time of the accident and on the dates the accident-related medical treatment was rendered to C.C., C.C. was enrolled in an MA Plan issued and administered by Wellcare of Florida, Inc. and serviced by Interamerican Medical Center Group , LLC ("IMC"), which is a risk-bearing Independent Practice Association ("IPA") located in Miami, Florida.

119.    A list of C.C.'s diagnosis codes and injuries in connection with C.C.'s accident-related treatment is attached hereto as Exhibit G.

120.    C.C.'s accident-related medical services were rendered on July 4, 2013. The IPA medical providers subsequently issued bills to IMC for payment of C.C.'s accident-related medical expenses.

121.    The IPA medical providers billed and charged IMC $4,083.17 for C.C.'s accident-related medical expenses, of which IMC paid $409.18 between August 8, 2013 and November 8, 2013.

---

[23] Plaintiffs are unable to allege with certainty the no-fault policy number covering this accident because different policy numbers were identified in the Section 111 reporting data obtained from MyAbility, the claims data reported to ISO, and the Florida Traffic Crash Report.

122.    By virtue of a no-fault policy which covered C.C. for the accident-related medical expenses detailed herein, Defendant USAA Casualty Insurance Company is a primary payer responsible for payment and/or reimbursement of C.C.'s accident-related medical expenses.

123.    Defendant USAA Casualty Insurance Company reported to CMS information regarding the accident, the name of the reporting entity, and the type of insurance policy involved, and admitted its primary payer status related to payment and/or reimbursement of C.C.'s accident-related medical expenses. Defendant reported responsibility under "United Services Automobile Assoc," but because of Defendant's imprecise reporting, Plaintiffs cannot confirm the insurer for this claimant.[24]

124.    This reporting demonstrates that Defendants were aware of the accident and their responsibility to reimburse IMC. Despite reporting that it was a primary payer, and the corresponding admission that it should have paid for C.C.'s accident-related injuries in the first instance, Defendant USAA Casualty Insurance Company failed to reimburse such payments, giving rise to a claim under the MSP Act.

125.    Accordingly, MSPAC is entitled to recover double the amount billed for C.C.'s accident-related medical expenses.

### The S.M. Claim Demonstrates MAO-MSO's Right to Recover for Defendants' Failure to Meet their Reimbursement Obligations under the MSP Act

126.    On January 8, 2015, S.M. was injured in an accident. As a direct and proximate result of the accident, S.M. sustained injuries that required medical items and services.

---

[24] Plaintiffs' identification of USAA Casualty Insurance Company as the responsible primary payer is based on the no-fault insurer identified in the Florida Traffic Crash Report as well as correspondence from USAA Casualty Insurance Company related to the claim. If Plaintiffs have identified the incorrect USAA affiliate, Plaintiffs reserve the right to amend this allegation to add the correct defendant.

127.    At the time of the accident, S.M.'s accident-related medical costs and expenses were covered under a no-fault policy issued by Defendant USAA General Indemnity Company under policy number 030054529G71010. By virtue of the no-fault policy, Defendant USAA General Indemnity Company was contractually obligated to pay and provide primary coverage for S.M.'s accident-related medical expenses.

128.    At the time of the accident and on the dates the accident-related medical treatment was rendered to S.M., S.M. was enrolled in an MA Plan issued and administered by Preferred Medical Plan, Inc. ("PMPI"). PMPI is an MA Plan.

129.    A list of S.M.'s diagnosis codes and injuries in connection with S.M.'s accident-related treatment is attached hereto as Exhibit H.

130.    S.M.'s accident-related medical services were rendered on January 8, 2015. The medical providers subsequently issued to PMPI bills for payment of S.M.'s accident-related medical expenses.

131.    The medical providers billed and charged PMPI $939.00 for S.M.'s accident-related medical expenses, of which PMPI paid $425.62 between July 14, 2015 and January 15, 2016.

132.    By virtue of a no-fault policy which covered S.M. for the accident-related medical expenses detailed herein, Defendant USAA General Indemnity Company is a primary payer responsible for payment and/or reimbursement of S.M.'s accident-related medical expenses.

133.    Accordingly, MAO-MSO is entitled to recover double the amount billed for S.M.'s accident-related medical expenses.

**The Settlement Claims Illustrating Standing[25]**

*The B.L. Claim Demonstrates MSPRC's Right to Recover for Defendants' Failure to Reimburse upon Entering into Settlements with Medicare Beneficiaries*

134.    On June 19, 2016, B.L. was injured in an accident. As a direct and proximate result of the accident, B.L. sustained injuries that required medical items and services.

135.    At the time of the accident, B.L.'s accident-related medical costs and expenses were covered under a liability policy (Policy No. 0080604654) issued by United Services Automobile Association. By virtue of its policy, Defendant United Services Automobile Association was contractually obligated to pay and provide primary coverage for B.L.'s accident-related medical expenses.

136.    At the time of the accident and on the dates the accident-related medical treatment was rendered to B.L., B.L. was enrolled in an MA Plan issued and administered by ConnectiCare, Inc. ("ConnectiCare") pursuant to CMS Contract ID Number H3528. ConnectiCare is an MA Plan.

137.    A list of B.L.'s diagnosis codes and injuries in connection with B.L.'s accident-related treatment is attached hereto as Exhibit I.

138.    B.L.'s accident-related medical services were rendered between June 19, 2016 and November 2, 2016. The medical providers subsequently issued bills to ConnectiCare for payment of B.L.'s accident-related medical expenses.

139.    The medical providers billed and charged ConnectiCare $21,608.73 for B.L.'s accident-related medical expenses, of which ConnectiCare paid $3,600.05 between July 5, 2016

---

[25] The information (settlement agreements) needed to confirm whether United Services Automobile Association and United Casualty Insurance Company entered into a settlement with the exemplar settlement beneficiaries are in Defendants' possession, custody, and control. Plaintiffs reserve their right to amend their allegations if the settlement agreements show that Defendants' generic reporting practices did not disclose the responsible underwriter.

and February 13, 2017.

140.     Specifically, at the time of the accident, the tortfeasor responsible for the incident that led to B.L.'s injuries was covered by a liability policy issued by Defendant United Services Automobile Association. Defendant United Services Automobile Association settled B.L.'s bodily injury claim on behalf of its insured and, as a result, was primarily responsible for the costs of B.L.'s accident-related medical expenses.

141.     As a result of that settlement, Defendant United Services Automobile Association reported to CMS information regarding the accident, the name of the reporting entity, and the type of insurance policy involved, and admitted its primary payer status related to payment and/or reimbursement of B.L.'s accident-related medical expenses. Defendant reported responsibility under "USAA," but because of Defendants' imprecise reporting, Plaintiffs cannot confirm the insurer for this claimant.[26]

142.     This reporting demonstrates that Defendant was aware of the accident and its responsibility to reimburse ConnectiCare. Despite reporting that it was a primary payer, and the corresponding admission that it should have paid for B.L.'s accident-related injuries, Defendant United Services Automobile Association failed to reimburse such payments, giving rise to a claim under the MSP Act.

143.     Plaintiffs reviewed ConnectiCare's carve-out list and confirmed that B.L. was not on the carve-out list. The B.L. claim is not an excluded claim under any of the assignment's carve-out provisions because: (1) it relates to healthcare services that were rendered and paid for by ConnectiCare between September 29, 2011 and September 29, 2017; (2) the claim is not one that

---

[26] If Plaintiffs have identified the incorrect USAA affiliate, Plaintiffs reserve the right to amend this allegation to add the correct defendant after receipt of the settlement agreement between the correct defendant and B.L.

can be asserted against ConnectiCare's members, enrollees, and/or contracted providers; and (3) the claim was not assigned to or being pursued by another recovery vendor as of March 20, 2018.

144.    Accordingly, MSPRC is entitled to collect double damages against Defendant United Services Automobile Association for its failure to reimburse ConnectiCare's conditional payment for B.L.'s accident-related expenses.

> ### The H.B. Claim Demonstrates MSPRC's Right to Recover for Defendants' Failure to Reimburse upon Entering into Settlements with Medicare Beneficiaries

145.    On May 8, 2017, H.B. was injured in an accident. As a direct and proximate result of the accident, H.B. sustained injuries that required medical items and services.

146.    At the time of the accident, H.B.'s accident-related medical costs and expenses were covered under a liability policy (Policy No. 0062008889) issued by United Services Automobile Association. By virtue of its policy, Defendant United Services Automobile Association was contractually obligated to pay and provide primary coverage for H.B.'s accident-related medical expenses.

147.    At the time of the accident and on the dates the accident-related medical treatment was rendered to H.B., H.B. was enrolled in an MA Plan issued and administered by ConnectiCare pursuant to CMS Contract ID Number H3528.

148.    A list of H.B.'s diagnosis codes and injuries in connection with H.B.'s accident-related treatment is attached hereto as Exhibit J.

149.    H.B.'s accident-related medical services were rendered between May 9, 2017 and June 15, 2017. The medical providers subsequently issued bills to ConnectiCare for payment of H.B.'s accident-related medical expenses.

150.    The medical providers billed and charged ConnectiCare $1,132.00 for H.B.'s

accident-related medical expenses, of which ConnectiCare paid $293.24 between May 18, 2017 and June 26, 2017.

151.    Specifically, at the time of the accident, the tortfeasor responsible for the incident that led to H.B.'s injuries was covered by a liability policy issued by Defendant United Services Automobile Association. Defendant United Services Automobile Association settled H.B.'s bodily injury claim on behalf of its insured and, as a result, was primarily responsible for the costs of H.B.'s accident-related medical expenses.

152.    As a result of that settlement, Defendant United Services Automobile Association reported to CMS information regarding the accident, the name of the reporting entity, and the type of insurance policy involved, and admitted its primary payer status related to payment and/or reimbursement of H.B.'s accident-related medical expenses. Defendant reported responsibility under "USAA," but because of Defendants' imprecise reporting, Plaintiffs cannot confirm the insurer for this claimant.[27]

153.    This reporting demonstrates that Defendant was aware of the accident and its responsibility to reimburse ConnectiCare. Despite reporting that it was a primary payer, and the corresponding admission that it should have paid for H.B.'s accident-related injuries, Defendant United Services Automobile Association failed to reimburse such payments, giving rise to a claim under the MSP Act.

154.    Plaintiffs reviewed ConnectiCare's carve-out listand confirmed that H.B. was not on the carve-out list. The H.B. claim is not an excluded claim under any of the assignment's carve-out provisions because: (1) it relates to healthcare services that were rendered and paid for by

---

[27] If Plaintiffs have identified the incorrect USAA affiliate, Plaintiffs reserve the right to amend this allegation to add the correct defendant after receipt of the settlement agreement between the correct defendant and H.B.

ConnectiCare between September 29, 2011 and September 29, 2017; (2) the claim is not one that can be asserted against ConnectiCare's members, enrollees, and/or contracted providers; and (3) the claim was not assigned to or being pursued by another recovery vendor as of March 20, 2018.

155.   Accordingly, MSPRC is entitled to collect double damages against Defendant United Services Automobile Association for its failure to reimburse ConnectiCare's conditional payment for H.B.'s accident-related expenses.

### The J.M. Claim Demonstrates MSPRC's Right to Recover for Defendants' Failure to Reimburse upon Entering into Settlements with Medicare Beneficiaries

156.   On June 18, 2016, J.M. was injured in an accident. As a direct and proximate result of the accident, J.M. sustained injuries that required medical items and services.

157.   At the time of the accident, J.M.'s accident-related medical costs and expenses were covered under a liability policy (Policy No. 0157663046) issued by United Services Automobile Association. By virtue of its policy, Defendant United Services Automobile Association was contractually obligated to pay and provide primary coverage for J.M.'s accident-related medical expenses.

158.   At the time of the accident and on the dates the accident-related medical treatment was rendered to J.M., J.M. was enrolled in an MA Plan issued and administered by ConnectiCare pursuant to CMS Contract ID Number H3528.

159.   A list of J.M.'s diagnosis codes and injuries in connection with J.M.'s accident-related treatment is attached hereto as Exhibit K.

160.   J.M.'s accident-related medical services were rendered between June 18, 2016 and July 22, 2016. The medical providers subsequently issued bills to ConnectiCare for payment of J.M.'s accident-related medical expenses.

161.    The medical providers billed and charged ConnectiCare $11,405.45 for J.M.'s accident-related medical expenses, of which ConnectiCare paid $790.93 between July 14, 2016 and November 10, 2016.

162.    Specifically, at the time of the accident, the tortfeasor responsible for the incident that led to J.M.'s injuries was covered by a liability policy issued by Defendant United Services Automobile Association. Defendant United Services Automobile Association settled J.M.'s bodily injury claim on behalf of its insured and, as a result, was primarily responsible for the costs of J.M.'s accident-related medical expenses.

163.    As a result of that settlement, Defendant United Services Automobile Association reported to CMS information regarding the accident, the name of the reporting entity, and the type of insurance policy involved, and admitted its primary payer status related to payment and/or reimbursement of J.M.'s accident-related medical expenses. Defendant reported responsibility under "USAA," but because of Defendants' imprecise reporting, Plaintiffs cannot confirm the insurer for this claimant.[28]

164.    This reporting demonstrates that Defendant was aware of the accident and its responsibility to reimburse ConnectiCare. Despite reporting that it was a primary payer, and the corresponding admission that it should have paid for J.M.'s accident-related injuries, Defendant United Services Automobile Association failed to remit and/or reimburse such payments, giving rise to a claim under the MSP Act.

165.    Plaintiffs reviewed ConnectiCare's carve-out list and confirmed that J.M. was not on the carve-out list. The J.M. claim is not an excluded claim under any of the assignment's carve-

---

[28] If Plaintiffs have identified the incorrect USAA affiliate, Plaintiffs reserve the right to amend this allegation to add the correct defendant after receipt of the settlement agreement between the correct defendant and J.M.

out provisions because: (1) it relates to healthcare services that were rendered and paid for by ConnectiCare between September 29, 2011 and September 29, 2017; (2) the claim is not one that can be asserted against ConnectiCare's members, enrollees, and/or contracted providers; and (3) the claim was not assigned to or being pursued by another recovery vendor as of March 20, 2018.

166.    Accordingly, MSPRC is entitled to collect double damages against Defendant United Services Automobile Association for its failure to reimburse ConnectiCare's conditional payment for J.M.'s accident-related expenses.

### The J.S. Claim Demonstrates MSPRC's Right to Recover for Defendants' Failure to Reimburse upon Entering into Settlements with Medicare Beneficiaries

167.    On January 21, 2016, J.S. was injured in an accident. As a direct and proximate result of the accident, J.S. sustained injuries that required medical items and services.

168.    At the time of the accident, J.S.'s accident-related medical costs and expenses were covered under a liability policy (Policy No. 007482557) issued by United Services Automobile Association. By virtue of its policy, Defendant United Services Automobile Association was contractually obligated to pay and provide primary coverage for J.S.'s accident-related medical expenses.

169.    At the time of the accident and on the dates the accident-related medical treatment was rendered to J.S., J.S. was enrolled in an MA Plan issued and administered by ConnectiCare pursuant to CMS Contract ID Number H3528.

170.    A list of J.S.'s diagnosis codes and injuries in connection with J.S.'s accident-related treatment is attached hereto as Exhibit L.

171.    J.S.'s accident-related medical services were rendered between January 21, 2016 and April 28, 2016. The medical providers subsequently issued bills to ConnectiCare for payment

of J.S.'s accident-related medical expenses.

172.    The medical providers billed and charged ConnectiCare $131,772.34 for J.S.'s accident-related medical expenses, of which ConnectiCare paid $36,409.09 between February 11, 2016 and August 18, 2016.

173.    Specifically, at the time of the accident, the tortfeasor responsible for the incident that led to J.S.'s injuries was covered by a liability policy issued by Defendant United Services Automobile Association. Defendant United Services Automobile Association settled J.S.'s bodily injury claim on behalf of its insured and, as a result, was primarily responsible for the costs of J.S.'s accident-related medical expenses.

174.    As a result of that settlement, Defendant United Services Automobile Association reported to CMS information regarding the accident, the name of the reporting entity, and the type of insurance policy involved, and admitted its primary payer status related to payment and/or reimbursement of J.S.'s accident-related medical expenses. Defendant reported responsibility under "USAA," but because of Defendants' imprecise reporting, Plaintiffs cannot confirm the insurer for this claimant.[29]

175.    This reporting demonstrates that Defendant was aware of the accident and its responsibility to reimburse ConnectiCare. Despite reporting that it was a primary payer, and the corresponding admission that it should have paid for J.S.'s accident-related injuries, Defendant United Services Automobile Association failed to reimburse such payments, giving rise to a claim under the MSP Act.

176.    Plaintiffs reviewed ConnectiCare's carve-out list and confirmed that J.S. was not

---

[29] If Plaintiffs have identified the incorrect USAA affiliate, Plaintiffs reserve the right to amend this allegation to add the correct defendant after receipt of the settlement agreement between the correct defendant and J.S.

on the carve-out list. The J.S. claim is not an excluded claim under any of the assignment's carve-out provisions because: (1) it relates to healthcare services that were rendered and paid for by ConnectiCare between September 29, 2011 and September 29, 2017; (2) the claim is not one that can be asserted against ConnectiCare's members, enrollees, and/or contracted providers; and (3) the claim was not assigned to or being pursued by another recovery vendor as of March 20, 2018.

177.    Accordingly, MSPRC is entitled to collect double damages against Defendant United Services Automobile Association for its failure to reimburse ConnectiCare's conditional payment for J.S.'s accident-related expenses.

### *The L.B. Claim Demonstrates MSPRC's Right to Recover for Defendants' Failure to Reimburse upon Entering into Settlements with Medicare Beneficiaries*

178.    On January 21, 2015, L.B. was injured in an accident. As a direct and proximate result of the accident, L.B. sustained injuries that required medical items and services.

179.    At the time of the accident, L.B.'s accident-related medical costs and expenses were covered under a liability policy (Policy No. 042426510) issued by USAA Casualty Insurance Company. By virtue of its policy, Defendant USAA Casualty Insurance Company was contractually obligated to pay and provide primary coverage for L.B.'s accident-related medical expenses.

180.    At the time of the accident and on the dates the accident-related medical treatment was rendered to L.B., L.B. was enrolled in an MA Plan issued and administered by ConnectiCare pursuant to CMS Contract ID Number H3528.

181.    A list of L.B.'s diagnosis codes and injuries in connection with L.B.'s accident-related treatment is attached hereto as Exhibit M.

182.    L.B.'s accident-related medical services were rendered between January 21, 2015

and March 16, 2015. The medical providers subsequently issued bills to ConnectiCare for payment of L.B.'s accident-related medical expenses.

183.    The medical providers billed and charged ConnectiCare $4,357.56 for L.B.'s accident-related medical expenses, of which ConnectiCare paid $1,144.55 between February 5, 2015 and March 19, 2015.

184.    Specifically, at the time of the accident, the tortfeasor responsible for the incident that led to L.B.'s injuries was covered by a liability policy issued by Defendant USAA Casualty Insurance Company. Defendant USAA Casualty Insurance Company settled L.B.'s bodily injury claim on behalf of its insured and, as a result, was primarily responsible for the costs of L.B.'s accident-related medical expenses.

185.    As a result of that settlement, Defendant USAA Casualty Insurance Company reported to CMS information regarding the accident, the name of the reporting entity, and the type of insurance policy involved, and admitted its primary payer status related to payment and/or reimbursement of L.B.'s accident-related medical expenses. Defendant reported responsibility under "USAA Insurance Company," but because of Defendants' imprecise reporting, Plaintiffs cannot confirm the insurer for this claimant.[30]

186.    This reporting demonstrates that Defendant was aware of the accident and its responsibility to reimburse ConnectiCare. Despite reporting that it was a primary payer, and the corresponding admission that it should have paid for L.B.'s accident-related injuries, Defendant USAA Casualty Insurance Company failed to reimburse such payments, giving rise to a claim under the MSP Act.

---

[30] If Plaintiffs have identified the incorrect USAA affiliate, Plaintiffs reserve the right to amend this allegation to add the correct defendant after receipt of the settlement agreement between the correct defendant and L.B.

187.    Plaintiffs reviewed ConnectiCare's carve-out list and confirmed that L.B. was not on the carve-out list. The L.B. claim is not an excluded claim under any of the assignment's carve-out provisions because: (1) it relates to healthcare services that were rendered and paid for by ConnectiCare between September 29, 2011 and September 29, 2017; (2) the claim is not one that can be asserted against ConnectiCare's members, enrollees, and/or contracted providers; and (3) the claim was not assigned to or being pursued by another recovery vendor as of March 20, 2018.

188.    Accordingly, MSPRC is entitled to collect double damages against Defendant USAA Casualty Insurance Company for its failure to reimburse ConnectiCare's conditional payment for L.B.'s accident-related expenses.

### The T.H. Claim Demonstrates Series 44's Right to Recover for Defendants' Failure to Meet their Reimbursement Obligations under the MSP Act

189.    On January 1, 2015, T.H. was injured in an accident. As a direct and proximate result of the accident, T.H. sustained injuries that required medical items and services.

190.    At the time of the accident, T.H.'s accident-related medical costs and expenses were covered under a liability policy (Policy No. 0334712232 or 033471223G71019)[31] issued by United Services Automobile Association. By virtue of its policy, Defendant United Services Automobile Association was contractually obligated to pay and provide primary coverage for T.H.'s accident-related medical expenses.

191.    At the time of the accident and on the dates the accident-related medical treatment was rendered to T.H., T.H. was enrolled in an MA Plan issued and administered by Health First

---

[31] Plaintiffs are unable to allege with certainty the no-fault policy number covering this accident because different policy numbers were identified in the Section 111 reporting data obtained from MyAbility and the Florida Traffic Crash Report.

Health Plans, Inc. ("HFHP") pursuant to CMS Contract ID Number H1099. HFHP is an MA Plan.[32]

192.     A list of T.H.'s diagnosis codes and injuries in connection with T.H.'s accident-related treatment is attached hereto as Exhibit N.

193.     T.H.'s accident-related medical services were rendered between January 8, 2015 and February 12, 2015. The medical providers subsequently issued to HFHP bills for payment of T.H.'s accident-related medical expenses.

194.     The medical providers billed and charged HFHP $1,283.81 for T.H.'s accident-related medical expenses, of which HFHP paid $150.81 between January 20, 2015 and September 20, 2015.

195.     Specifically, at the time of the accident, the tortfeasor responsible for the incident that led to T.H.'s injuries was covered by a liability policy issued by Defendant United Services Automobile Association. Defendant United Services Automobile Association settled T.H.'s bodily injury claim on behalf of its insured and, as a result, was primarily responsible for the costs of T.H.'s accident-related medical expenses.

196.     As a result of that settlement, Defendant reported to CMS information regarding the accident, the name of the reporting entity, and the type of insurance policy involved, and admitted its primary payer status related to payment and/or reimbursement of T.H.'s accident-related medical expenses. Defendant reported responsibility under "USAA," but because of Defendant's imprecise reporting, Plaintiffs cannot confirm the insurer for this claimant.[33]

---

[32] HFHP is duly authorized to provide Medicare benefits through CMS Contract ID Number H1099.

[33] If Plaintiffs have identified the incorrect USAA affiliate, Plaintiffs reserve the right to amend this allegation to add the correct defendant after receipt of the settlement agreement between the correct defendant and T.H.

197.     This reporting demonstrates that Defendant was aware of the accident and its responsibility to reimburse HFHP. Despite reporting that it was a primary payer, and the corresponding admission that it should have paid for T.H.'s accident-related injuries in the first instance, Defendant United Services Automobile Association failed to reimburse such payments, giving rise to a claim under the MSP Act.

198.     Because HFHP made payment on behalf of T.H. for dates of services between February 5, 2007 and November 23, 2016, and the T.H. claim has not previously been the subject of a subrogation case by HFHP, the T.H. claim falls within the Assigned Claims under the HFHP Assignment and has not otherwise been excluded from the Assigned Claims.

199.     Accordingly, Series 44 is entitled to collect double damages against Defendant United Services Automobile Association for its failure to reimburse HFHP's conditional payment for T.H.'s accident-related medical expenses.

### The D.C. Claim Demonstrates Series 44's Right to Recover for Defendants' Failure to Meet their Reimbursement Obligations under the MSP Act

200.     On June 2, 2016, D.C. was injured in an accident. As a direct and proximate result of the accident, D.C. sustained injuries that required medical items and services.

201.     At the time of the accident, D.C.'s accident-related medical costs and expenses were covered under a liability policy (Policy No. 001154682515) issued by United Services Automobile Association. By virtue of its policy, Defendant United Services Automobile Association was contractually obligated to pay and provide primary coverage for D.C.'s accident-related medical expenses.

202.     At the time of the accident and on the dates the accident-related medical treatment was rendered to D.C., D.C. was enrolled in an MA Plan issued and administered by HFHP pursuant

to CMS Contract ID Number H1099.

203.    A list of D.C.'s diagnosis codes and injuries in connection with D.C.'s accident-related treatment is attached hereto as Exhibit O.

204.    D.C.'s accident-related medical services were rendered on June 29, 2016. The medical providers subsequently issued to HFHP bills for payment of D.C.'s accident-related medical expenses.

205.    The medical providers billed and charged HFHP $5,513.40 for D.C.'s accident-related medical expenses, of which HFHP paid $707.01 between July 10, 2016 and July 24, 2016.

206.    Specifically, at the time of the accident, the tortfeasor responsible for the incident that led to D.C.'s injuries was covered by a liability policy issued by Defendant United Services Automobile Association. Defendant United Services Automobile Association settled D.C.'s bodily injury claim on behalf of its insured and, as a result, was primarily responsible for the costs of D.C.'s accident-related medical expenses.

207.    As a result of that settlement, Defendant reported to CMS information regarding the accident, the name of the reporting entity, and the type of insurance policy involved, and admitted its primary payer status related to payment and/or reimbursement of D.C.'s accident-related medical expenses. Defendant reported responsibility under "USAA," but because of Defendants' imprecise reporting, Plaintiffs cannot confirm the insurer for this claimant.[34]

208.    This reporting demonstrates that Defendant was aware of the accident and its responsibility to reimburse HFHP. Despite reporting that it was a primary payer, and the corresponding admission that it should have paid for D.C.'s accident-related injuries in the first

---

[34] If Plaintiffs have identified the incorrect USAA affiliate, Plaintiffs reserve the right to amend this allegation to add the correct defendant after receipt of the settlement agreement between the correct defendant and D.C.

instance, Defendant United Services Automobile Association failed to reimburse such payments, giving rise to a claim under the MSP Act.

209.    Because HFHP made payment on behalf of D.C. for dates of services between February 5, 2007 and November 23, 2016, and the D.C. claim has not previously been the subject of a subrogation case by HFHP, the D.C. claim falls within the Assigned Claims under the HFHP Assignment and has not otherwise been excluded from the Assigned Claims.

210.    Accordingly, Series 44 is entitled to collect double damages against Defendant United Services Automobile Association for its failure to reimburse HFHP's conditional payment for D.C.'s accident-related medical expenses.

### *The M.B. Claim Demonstrates MSPRC's Right to Recover for Defendant's Failure to Reimburse upon Entering into Settlements with Medicare Beneficiaries*

211.    On January 21, 2015, M.B. was injured in an accident. As a direct and proximate result of the accident, M.B. sustained injuries that required medical items and services.

212.    At the time of the accident, M.B.'s accident-related medical costs and expenses were covered under a liability policy (Policy No. 041329870) issued by USAA Casualty Insurance Company. By virtue of its policy, Defendant USAA Casualty Insurance Company was contractually obligated to pay and provide primary coverage for M.B.'s accident-related medical expenses.

213.    At the time of the accident and on the dates the accident-related medical treatment was rendered to M.B., M.B. was enrolled in an MA Plan issued and administered by ConnectiCare pursuant to CMS Contract ID Number H3528.

214.    A list of M.B.'s diagnosis codes and injuries in connection with M.B.'s accident-related treatment is attached hereto as Exhibit P.

215.    M.B.'s accident-related medical services were rendered between January 21, 2015 and July 9, 2015. The medical providers subsequently issued bills to ConnectiCare for payment of M.B.'s accident-related medical expenses.

216.    The medical providers billed and charged ConnectiCare $11,105.79 for M.B.'s accident-related medical expenses, of which ConnectiCare paid $3,579.95 between February 9, 2015 and July 20, 2015.

217.    Specifically, at the time of the accident, the tortfeasor responsible for the incident that led to M.B.'s injuries was covered by a liability policy issued by Defendant USAA Casualty Insurance Company. Defendant USAA Casualty Insurance Company settled M.B.'s bodily injury claim on behalf of its insured and, as a result, was primarily responsible for the costs of M.B.'s accident-related medical expenses.

218.    As a result of that settlement, USAA Casualty Insurance Company reported to CMS information regarding the accident, the name of the reporting entity, and the type of insurance policy involved, and admitted its primary payer status related to payment and/or reimbursement of M.B.'s accident-related medical expenses. Defendant reported responsibility under "USAA Insurance Company," but because of Defendants' imprecise reporting, Plaintiffs cannot confirm the insurer for this claimant.[35]

219.    This reporting demonstrates that Defendant was aware of the accident and its responsibility to reimburse ConnectiCare. Despite reporting that it was a primary payer, and the corresponding admission that it was statutorily obligated to pay for M.B.'s accident-related injuries, Defendant failed to reimburse ConnectiCare's conditional payments, giving rise to a claim

---

[35] If Plaintiffs have identified the incorrect USAA affiliate, Plaintiffs reserve the right to amend this allegation to add the correct defendant after receipt of the settlement agreement between the correct defendant and M.B.

under the MSP Act.

220.    Plaintiffs reviewed ConnectiCare's carve-out list and confirmed that M.B. was not on the carve-out list. The M.B. claim is not an excluded claim under any of the assignment's carve-out provisions because: (1) it relates to healthcare services that were rendered and paid for by ConnectiCare between September 29, 2011 and September 29, 2017; (2) the claim is not one that can be asserted against ConnectiCare's members, enrollees, and/or contracted providers; and (3) the claim was not assigned to or being pursued by another recovery vendor as of March 20, 2018.

221.    Accordingly, MSPRC is entitled to recover double the amount billed for M.B.'s accident-related medical expenses.

## CLASS ACTION ALLEGATIONS

222.    This matter is brought as a class action pursuant to Federal Rule of Civil Procedure 23, on behalf of all Class Members or their assignees who paid for their beneficiaries' accident-related medical expenses, when Defendants should have made those payments as primary payers in the first instance or reimbursed the Class Members.

223.    As discussed in this class action Complaint, Defendants have failed to provide primary payment and/or appropriately reimburse the Class Members for money they were statutorily required to pay under the MSP Act. This failure to reimburse applies to Plaintiffs, as the rightful assignees of those organizations that assigned their recovery rights to Plaintiffs and to all Class Members. Class action law has long recognized that when a company engages in conduct that has uniformly harmed a large number of claimants, class resolution is an effective tool to redress the harm. This case is well suited for class-wide resolution.

224.    Class Members have been unlawfully burdened with paying for the medical costs of their beneficiaries when the law explicitly requires Defendants to make such payments. The

Medicare Act and its subsequent amendments were constructed to ensure an efficient and cost-effective system of cooperation and communication between primary and secondary payers. Defendants' failure to reimburse Plaintiffs' assignors and Class Members runs afoul of the Medicare Act and has directly contributed to the ever-increasing costs of the Medicare system.

225.    The Class is properly brought and should be maintained as a class action under Rule 23(a), satisfying the class action prerequisites of numerosity, commonality, typicality, adequacy, and ascertainability shown as follows:

a.  **Numerosity**:  Joinder of all members is impracticable. Upon information and belief, there are hundreds of MA Plans (including their assignees) throughout the United States who (1) were not reimbursed by Defendants under no-fault policies which provided coverage for medical expenses arising out of accidents, or (2) were not reimbursed by Defendants after they entered into a settlement with Medicare beneficiaries enrolled in MA Plans. Thus, the numerosity element for class certification is met.

b.  **Commonality**: Questions of law and fact are common to all members of the Class. Specifically, Defendants' misconduct was directed at all Class Members, their affiliates, and those respective organizations that contracted with CMS and were identified as "secondary payers" by Medicare Part C. Defendants failed to reimburse conditional payments, report settlements and report their Ongoing Responsibility for Medicals ("ORM") involving individuals who were Medicare beneficiaries, and ensure that Medicare remained a secondary payer, as a matter of course. Thus, all Class Members have common questions of fact and law, *i.e.*, whether Defendants failed to comport with their statutory duty to pay or reimburse

MA Plans pursuant to the MSP Act. Each Class Member shares the same needed remedy, *i.e.*, reimbursement. Plaintiffs seek to enforce their own rights, as well as the reimbursement rights of the Class Members, for medical payments made on behalf of their Enrollees, as a result of Defendants' practice and course of conduct in failing to make primary payment or properly providing appropriate reimbursement.

c. **<u>Typicality</u>**:  Plaintiffs' claims are typical of the Class Members' claims, as all have been damaged in the same manner. Plaintiffs' and the Class Members' claims have the same essential characteristics, arise from the same course of conduct, and share the same legal theory. As the putative class representatives, Plaintiffs possess the same interests and suffered the same injury as the other Class Members, thereby demonstrating a legally sufficient nexus between Plaintiffs' claims and the Class Members' claims. Plaintiffs' claims are typical of the Class Members' claims because Defendants failed to make primary payments for Enrollees' accident-related medical expenses, which they were obligated to do pursuant to their settlements with, or contractual obligations to, Enrollees. Plaintiffs' claims are typical because Plaintiffs, like the Class Members, have a right to relief for Defendants' failure to make primary payments or reimburse Plaintiffs' assignors and the Class Members for their conditional payments of Enrollees' accident-related medical expenses. Plaintiffs' and the Class Members' claims are based on the same statutes, regulations, legal theories and factual situations. Defendants' business practices, acts and omissions are materially the same with respect to Plaintiffs' and the Class Members' claims, as will be Defendants' legal defenses. Plaintiffs' claims are, therefore, typical of

the Class.

d. **<u>Adequacy</u>**:  Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs' interests in vindicating these claims are shared with all members of the Class and there are no conflicts between the named Plaintiffs and the putative Class Members. In addition, Plaintiffs are represented by counsel who are competent and experienced in class action litigation and also have no conflicts.

e. **<u>Ascertainability</u>**:  Locating members of the Class would be relatively simple, since CMS maintains records of all MA Plans and providing notice to such entities could be accomplished by direct communication.

226.     The Class is properly brought and should be maintained as a class action under Rule 23(b)(3) because a class action in this context is superior. Pursuant to Rule 23(b)(3), common issues of law and fact predominate over any questions affecting only individual members of the Class ("Damages Class"). Defendants, whether deliberately or not, failed to make required payments under the MSP Act and failed to reimburse Class Members and those organizations that assigned their recovery rights to Plaintiffs, thus depriving Plaintiffs, as assignees of the right to recovery, and Class Members of their statutory right to payment and reimbursement.

227.     It is the custom and practice of CMS and primary plans to maintain records in a detailed electronic format. Based on these practices, Plaintiffs maintain a reasonable methodology for generalized proof of class-wide impact using the MSP System. The MSP System captures, compiles, synthesizes and analyzes large amounts of data to identify claims for reimbursement of conditional payments. This case will not present manageability problems as compared to non-electronic data driven class actions. There is no need for a fact-specific individual analysis of intent or causation, and damages will be calculated based upon the total fee-for-service amounts

associated with the payments made on behalf of Enrollees. Plaintiffs are capable of using the MSP System to identify and quantify Class Members' claims, as they have done for their own claims.

228.    Proceeding with a Damages Class is superior to other methods for fair and efficient adjudication of this controversy because, *inter alia*, such treatment will allow a large number of similarly-situated assignors to litigate their common claims simultaneously, efficiently, and without the undue duplications of effort, evidence, and expense that several individual actions would induce; individual joinder of the individual members is wholly impracticable; the economic damages suffered by the individual class members may be relatively modest compared to the expense and burden of individual litigation; and the court system would benefit from a class action because individual litigation would overload court dockets and magnify the delay and expense to all parties. The class action device presents far fewer management difficulties and provides the benefit of comprehensive supervision by a single court with economies of scale.

229.    Administering the proposed Damages Class will be relatively simple. Defendants provided no-fault policies to individuals who are also Medicare beneficiaries and/or liability policies to individuals who caused accidents injuring Medicare beneficiaries. Once that data identifying these policies and/or claims is compiled and organized, Plaintiffs can determine which claimants and/or policyholders were Medicare beneficiaries during the applicable time. Then, using the database, Plaintiffs and the Class Members can identify unreimbursed conditional payments made for accident-related medical expenses where Defendants were primary payers.

## CLASS DEFINITION

230.    The putative class (referred to herein as "Class Members") is defined as:

### Contractual Obligations Class

All MA Plans (or their assignees) that provide benefits under Medicare Part C, in the United States of America and its territories, who made payments for a Medicare Enrollee's

accident-related medical expenses within the last six years from the filing of the complaint where Defendants:

(1) are the primary payers by virtue of having a contractual obligation to pay for the items and services that are required to be covered by the policy of insurance of the same Medicare Enrollees; and

(2) failed to pay for the items and services or otherwise failed to reimburse MA Plans (or their assignees) for the items and services that were provided related to the claims of the Medicare Enrollees.

This class definition excludes (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; and (b) any judges or justices involved in this action and any members of their immediate families.

### Settlement Class

All MA Plans (or their assignees) that provide benefits under Medicare Part C, in the United States of America and its territories, who made payments for a Medicare Enrollee's medical expenses where Defendants:

(1) are the primary payers by virtue of having settled a claim with an MA Plan Enrollee;

(2) settled a dispute to pay for medical expenses with an MA Plan Enrollee; and

(3) failed to reimburse MA Plans (or their assignees) for their conditional payments upon settling with a Medicare Enrollee.

This class definition excludes (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; and (b) any judges or justices involved in this action and any members of their immediate families.

231.    All conditions precedent to the filing of this lawsuit have occurred, been performed, or have been otherwise waived by Defendants.

### COUNT I
### Private Cause of Action Under 42 U.S.C. § 1395y(b)(3)(A)
*(Against Defendant United Services Automobile Association)*

232.    Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in paragraphs 1-18, 21-71, 134-177, 189-210, and 222-231 as if fully set forth herein.

233.    Plaintiffs assert a private cause of action pursuant to 42 U.S.C. § 1395y(b)(3)(A)

on behalf of themselves and all similarly situated parties.

234.    The elements of a cause of action under 42 U.S.C. § 1395y(b)(3)(A) are: (1) the defendant's status as a primary plan; (2) the defendant's failure to provide for primary payment or appropriate reimbursement; and (3) damages. *Humana Med. Plan, Inc. v. W. Heritage Ins. Co.*, 832 F.3d 1229, 1239 (11th Cir. 2016).

235.    Defendant United Services Automobile Association's no-fault and liability policies are primary plans, which rendered it the primary payer for accident-related medical expenses.

236.    As part of providing Medicare benefits to Medicare beneficiaries enrolled under the Medicare Advantage program, the Class Members and Plaintiffs' assignors paid for items and services which were also covered by no-fault policies issued by Defendant United Services Automobile Association.

237.    More specifically, Plaintiffs' and the Class Members' Enrollees were also covered by no-fault, PIP, or Med Pay policies issued by Defendant United Services Automobile Association.

238.    In addition, Defendant United Services Automobile Association entered into settlements with Enrollees of Plaintiffs' assignors relating to accidents but failed to reimburse Plaintiffs' assignors and the putative Class Members for accident-related medical expenses paid by Plaintiffs' assignors and the putative Class Members on behalf of Enrollees. Defendant United Services Automobile Association is liable for reimbursement of these accident-related medical expenses even if it subsequently paid out the maximum benefits under the policies.

239.    Because Defendant United Services Automobile Association is a primary payer, the Medicare payments for which Plaintiffs seek reimbursement were conditional payments under the MSP Act.

240.     Defendant United Services Automobile Association is required to timely reimburse Plaintiffs' assignors and Class Members for their conditional payments of Enrollees' accident-related medical expenses. *See* 42 U.S.C. § 1395y(b)(2)(ii); 42 C.F.R. § 411.22(b)(3); *MSP Recovery, LLC v. Allstate Ins. Co.*, 835 F.3d 1351, 1355 (11th Cir. 2016). Defendant United Services Automobile Association failed to do so.

241.     Plaintiffs and the Class Members have suffered money damages as a direct result of Defendant United Services Automobile Association's failure to reimburse the accident-related medical expenses.

242.     Defendant United Services Automobile Association derived substantial profits by placing the burden of financing medical treatments for its policyholders on the shoulders of Plaintiffs' assignors and the Class Members.

243.     In this case, Defendant United Services Automobile Association has failed to administratively appeal Plaintiffs' assignors' rights to reimbursement within the administrative remedies period on a class-wide basis. Defendant United Services Automobile Association, therefore, is time-barred from challenging the propriety of amounts paid.

244.     Plaintiffs, for themselves and on behalf of the Class Members, bring this claim pursuant to 42 U.S.C. § 1395y(b)(3)(A), to recover double damages from Defendant United Services Automobile Association for its failure to make appropriate and timely reimbursement of conditional payments for Enrollees' accident-related medical expenses.

## COUNT II
### Private Cause of Action Under 42 U.S.C. § 1395y(b)(3)(A)

(*Against Defendant USAA General Indemnity Company*)

245.     Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in paragraphs 1-17, 20-71, 105-115, 126-133, and 222-231 as if fully set forth herein.

246.     Plaintiffs assert a private cause of action pursuant to 42 U.S.C. § 1395y(b)(3)(A) on behalf of themselves and all similarly situated parties.

247.     The elements of a cause of action under 42 U.S.C. § 1395y(b)(3)(A) are: (1) the defendant's status as a primary plan; (2) the defendant's failure to provide for primary payment or appropriate reimbursement; and (3) damages. *W. Heritage*, 832 F.3d at 1239.

248.     Defendant USAA General Indemnity Company's no-fault and liability policies are primary plans, which rendered it the primary payer for accident-related medical expenses.

249.     As part of providing Medicare benefits to Medicare beneficiaries enrolled under the Medicare Advantage program, the Class Members and Plaintiffs' assignors paid for items and services which were also covered by no-fault policies issued by Defendant USAA General Indemnity Company.

250.     More specifically, Plaintiffs' and the Class Members' Enrollees were also covered by no-fault, PIP, or Med Pay policies issued by Defendant USAA General Indemnity Company.

251.     In addition, Defendant USAA General Indemnity Company entered into settlements with Enrollees of Plaintiffs' assignors relating to accidents but failed to reimburse Plaintiffs' assignors and the putative Class Members for accident-related medical expenses paid by Plaintiffs' assignors and the putative Class Members on behalf of Enrollees. Defendant USAA General Indemnity Company is liable for reimbursement of these accident-related medical expenses even if it subsequently paid out the maximum benefits under the policies.

252.     Because Defendant USAA General Indemnity Company is a primary payer, the Medicare payments for which Plaintiffs seek reimbursement were conditional payments under the MSP Act.

253.     Defendant USAA General Indemnity Company is required to timely reimburse

56

Plaintiffs' assignors and Class Members for their conditional payments of Enrollees' accident-related medical expenses. *See* 42 U.S.C. § 1395y(b)(2)(ii); 42 C.F.R. § 411.22(b)(3); *Allstate*, 835 F.3d at 1355. Defendant USAA General Indemnity Company failed to do so.

254.    Plaintiffs and the Class Members have suffered money damages as a direct result of Defendant USAA General Indemnity Company's failure to reimburse the accident-related medical expenses.

255.    Defendant USAA General Indemnity Company derived substantial profits by placing the burden of financing medical treatments for its policyholders on the shoulders of Plaintiffs' assignors and the Class Members.

256.    In this case, Defendant USAA General Indemnity Company has failed to administratively appeal Plaintiffs' assignors' rights to reimbursement within the administrative remedies period on a class-wide basis. Defendant USAA General Indemnity Company, therefore, is time-barred from challenging the propriety of amounts paid.

257.    Plaintiffs, for themselves and on behalf of the Class Members, bring this claim pursuant to 42 U.S.C. § 1395y(b)(3)(A), to recover double damages from Defendant USAA General Indemnity Company for its failure to make appropriate and timely reimbursement of conditional payments for Enrollees' accident-related medical expenses.

## COUNT III
## Private Cause of Action Under 42 U.S.C. § 1395y(b)(3)(A)

(*Against Defendant USSA Casualty Insurance Company*)

258.    Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in paragraphs 1-17, 19, 21-104, 116-125, 178-188, and 211-231 as if fully set forth herein.

259.    Plaintiffs assert a private cause of action pursuant to 42 U.S.C. § 1395y(b)(3)(A)

on behalf of themselves and all similarly situated parties.

260.    The elements of a cause of action under 42 U.S.C. § 1395y(b)(3)(A) are: (1) the defendant's status as a primary plan; (2) the defendant's failure to provide for primary payment or appropriate reimbursement; and (3) damages. *W. Heritage*, 832 F.3d at 1239.

261.    Defendant USAA Casualty Insurance Company's no-fault and liability policies are primary plans, which rendered it the primary payer for accident-related medical expenses.

262.    As part of providing Medicare benefits to Medicare beneficiaries enrolled under the Medicare Advantage program, the Class Members and Plaintiffs' assignors paid for items and services which were also covered by no-fault policies issued by Defendant USAA Casualty Insurance Company.

263.    Defendant USAA Casualty Insurance Company entered into settlements with Enrollees of Plaintiffs' assignors relating to accidents but failed to reimburse Plaintiffs' assignors and the putative Class Members for accident-related medical expenses paid by Plaintiffs' assignors and the putative Class Members on behalf of Enrollees. Defendant USAA Casualty Insurance Company is liable for reimbursement of these accident-related medical expenses even if it subsequently paid out the maximum benefits under the policies.

264.    Because Defendant USAA Casualty Insurance Company is a primary payer, the Medicare payments for which Plaintiffs seek reimbursement were conditional payments under the MSP Act.

265.    Defendant USAA Casualty Insurance Company is required to timely reimburse Plaintiffs' assignors and Class Members for their conditional payments of Enrollees' accident-related medical expenses. *See* 42 U.S.C. § 1395y(b)(2)(ii); 42 C.F.R. § 411.22(b)(3); *Allstate*, 835 F.3d at 1355. Defendant USAA Casualty Insurance Company failed to do so.

266.    Plaintiffs and the Class Members have suffered money damages as a direct result of Defendant USAA Casualty Insurance Company's failure to reimburse the accident-related medical expenses.

267.    Defendant USAA Casualty Insurance Company derived substantial profits by placing the burden of financing medical treatments for its policyholders on the shoulders of Plaintiffs' assignors and the Class Members.

268.    In this case, Defendant USAA Casualty Insurance Company has failed to administratively appeal Plaintiffs' assignors' rights to reimbursement within the administrative remedies period on a class-wide basis. Defendant USAA Casualty Insurance Company, therefore, is time-barred from challenging the propriety of amounts paid.

269.    Plaintiffs, for themselves and on behalf of the Class Members, bring this claim pursuant to 42 U.S.C. § 1395y(b)(3)(A), to recover double damages from Defendant USAA Casualty Insurance Company for its failure to make appropriate and timely reimbursement of conditional payments for Enrollees' accident-related medical expenses.

## JURY TRIAL DEMAND

270.    Plaintiffs demand a trial by jury on all of the triable issues within this pleading.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of the Class Members described herein, pray for the following relief:

    a.  find that this action satisfies the prerequisites for maintenance of a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), and certify the respective Class;

    b.  designate Plaintiffs as representatives for the respective Class Members and Plaintiffs' undersigned counsel as Class Counsel for the respective Class; and

    c.  issue a judgment against Defendants that:

i.  grants Plaintiffs and the Class Members reimbursement of double damages for those monies to which the Class is entitled under 42 U.S.C. § 1395y(b)(3)(A), as alleged in Counts I, II and III;

ii.  grants Plaintiffs and the Class Members pre-judgment and post-judgment interest consistent with the statute; and

iii.  grants Plaintiffs and the Class Members such other and further relief as the Court deems just and proper under the circumstances.

Dated: June 11, 2021                    Respectfully submitted,

*/s/ Francesco A. Zincone*
Francesco A. Zincone
Florida Bar No. 100096
**ARMAS BERTRAN PIERI**
4960 SW 72nd Avenue, Suite 206
Miami, Florida 33155
Telephone: (305) 461-5100
fzincone@armaslaw.com

Christopher L. Coffin (admitted *pro hac vice*)
Tracy L. Turner (admitted *pro hac vice*)
Shannon A. Shelton (admitted *pro hac vice*)
**PENDLEY, BAUDIN & COFFIN, LLP**
1100 Poydras Street, Suite 2225
New Orleans, Louisiana 70163
Telephone:  (504) 355-0086
Facsimile:  (504) 355-0089
ccoffin@pbclawfirm.com
tturner@pbclawfirm.com
sshelton@pbclawfirm.com

*Counsel for Plaintiffs*

60

## APPENDIX 1

### CMS' Standard for Storing Digital Health Insurance Claims Data

1.      It is the custom and practice of CMS and primary plans to maintain records in a detailed electronic format. According to the U.S. Department of Health and Human Services (HHS), CMS, federal statutes, and industry best practices and guidelines, the standard format for storing digital health insurance claims data is an electronic data interchange ("EDI") format called 837P ("837").

      a.   The 837 standard is mandated by the federal government and used federal and state payors such as Medicare and Medicaid.

      b.   The 837 standard is also used by private insurers, hospitals, clinics, physicians and other health care providers (i.e., HIPAA covered entities) who typically adopt CMS standards.

      c.   Paper claims are captured in the CMS 1500, UB04, and UB92 forms, but electronically, the standard for storing data is the 837 format.

2.      Essential components of an 837-claim file include but are not limited to the date(s) of service, diagnosis code(s) and medical procedure code(s).

      a.   Dates (including dates of service): the standard format for dates in electronic health care claims is YYYYMMDD, CCYYMMDD, or MM/DD/YYYY.

           i.   According to industry best practices and guidelines, and HHS and CMS, the standard format for expressing dates in healthcare insurance claims data is CCYYMMDD (CC representing two numeric digits to indicate Century, YY representing two numeric digits for year, MM representing two digits for the month, and DD representing two digits for the day of the month).

61

Sometimes this is alternately expressed as YYYYMMDD.[36]

ii.   The CCYYMMDD date format standard has been in place for many years. *See* CMS Guidance for 2010[37], 2011[38], 2012[39], 2013[40], 2014[41], and 2016.[42]

iii.   CMS has also accepted the MM/DD/YYYY format for its local coverage determination data.[43]

iv.   The purpose of the date format is to ensure that dates of health care claims such as the date a medical procedure was provided (date of service or

---

[36] *See* the Medicare Claims Processing Manual Chapter 3 and CMS Manual System, Pub 100-08 Medicare Program Integrity, Transmittal 721.

[37] CMS Manual System, Pub 100-20 One-Time Notification, Transmittal 761 (Aug. 20, 2010), *available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/downloads/R761OTN.pdf.

[38] CMS Manual System, Pub 100-20 One-Time Notification, Transmittal 988 (Oct. 28, 2011), *available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/downloads/R988OTN.pdf.

[39] CMS Manual System, Pub 100-20 One-Time Notification, Transmittal 1050 (Feb. 29, 2012), *available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/Downloads/R1050OTN-.pdf.

[40] CMS Manual System, Pub 100-20 One-Time Notification, Transmittal 1277 (Aug. 9, 2013), *available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/downloads/R1277OTN.pdf.

[41] Memorandum from Tracey McCutcheon, Acting Director, Medicare Drug Benefit and C & D Data Group, and Laurence Wilson, Director, Chronic Care Policy Group, to All Part D Plan Sponsors and Medicare Hospice Providers (Mar. 10, 2014) (on file with author), *available at* https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/Hospice/Downloads/Part-D-Payment-Hospice-Final-2014-Guidance.pdf.

[42] Memorandum from Cheri Rice, Director, Medicare Plan Payment Group, and Cathy Carter, Director, Enterprise Systems Solutions Group, to All Medicare Advantage, Prescription Drug Plan, Cost, PACE, and Demonstration Organizations Systems Staff (Nov. 9, 2016) (on file with author), *available at* https://www.cms.gov/Research-Statistics-Data-and-Systems/CMS-Information-Technology/mapdhelpdesk/Downloads/Announcement-of-the-February-2017-Software-Release.pdf.

[43] Local Coverage Determination (LCD) Date of Service Criteria, *available at* https://www.cms.gov/medicare-coverage-database/search/lcd-date-search.aspx?DocID=L35093&bc=gAAAAAAAAAAA.

"DOS") in comparison to the date of settlement, can be searched, sorted and properly selected as compensable or non-compensable claims.

    v.  In general, ensuring the accuracy of dates, and other data is essential to analyzing claims data files by health insurers and others who may need to determine the value of claims, the relevance of particular claims with respect to patient conditions, dates of care, or whether the claim is compensable.

  b.  <u>Medical Diagnosis and Procedure Codes</u>:

    i.  Diagnosis-Related Group (DRG) – DRGs are a statistical system of classifying any inpatient stay into groups for the purposes of payment. The DRG classification system divides possible diagnoses into more than 20 major body systems and subdivides them into almost 500 groups for the purpose of Medicare reimbursement. Factors used to determine the DRG payment amount include the diagnosis involved as well as the hospital resources necessary to treat the condition.[44][45]

    ii.  International Classification of Diseases (ICD-9 and ICD-10) – Hospitals report diagnosis information using codes from the ICD-9-CM (the International Classification of Diseases, 9th Edition, Clinical Modification

---

[44] Gillian I. Russell, Terminology, in FUNDAMENTALS OF HEALTH LAW 1, 12 (American Health Lawyers Association 5th ed., 2011).

[45] Beginning in 2007, CMS overhauled the DRG system with the development of "severity-adjusted DRGs" and began to replace DRGs with "Medicare-severity DRGs" or "MS-DRGs" through a three-year phase-in period that blended payment under the old DRG system and the MS-DRG system. In a small number of MS-DRGs, classification is also based on the age, gender, and discharge status of the patient. The diagnosis and discharge information are reported by the hospital using codes from the ICD-9-CM or ICD-10-CM if the date of service is on or after October 1, 2015.

if the date of service is before October 1, 2015) or ICD-10 CM (if the date of service is on or after October 1, 2015).

iii.  Inpatient medical procedures ICD-9 Volume 2 and Volume 3 and ICD-10 PCS – These codes are used to describe inpatient medical procedures, excluding the physician's bill.

iv.  Current Procedural Terminology ("CPT") – CPT[46] codes are a standardized listing of descriptive terms and identifying codes for reporting outpatient medical services and procedures as well as both inpatient and outpatient physician services. The current version, CPT-4, is maintained by the American Medical Association and is an accepted standard by the National Committee on Vital Statistics or NCVHS.[47]

v.  Ambulatory Patient Classification (APC) – Services performed in outpatient ambulatory surgery centers may be classified by APCs. CMS assigns individual services to APCs based on similar clinical characteristics and similar costs.[48]

vi.  Healthcare Common Procedure Coding System (HCPCS) – HCPCS is

---

[46] CPT codes and descriptions are copyrights of the American Medical Association Current Procedural Terminology.

[47] National Committee on Vital and Health Statistics, Consolidated Health Informatics Initiative, *available at* http://www.ncvhs.hhs.gov/meeting-calendar/agenda-of-the-december-9-10-2003-ncvhs-subcommittee-on-standards-and-security-hearing/consolidated-health-informatics-initiative-final-recommendation-information-sheet-billingfinancial-for-the-december-9-2003-ncvhs-subcommittee-on-standards-and-security-hearing/.

[48] CMS, Hospital Outpatient Prospective Payment System, Partial Hospitalization services furnished by hospitals or Community Mental Health Centers, Ambulatory Payment System, https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/downloads/HospitalOutpaysysfctsht.pdf.

mainly used to indicate medical supplies, durable medical goods, ambulance services, and durable medical equipment, prosthetics, orthotics and supplies (DMEPOS).[49]

vii. Medical Data Code Sets – The standard Code set for medical diagnosis and procedure codes in health care claims is a series of digits as specified in 45 C.F.R. § 162.1002.

viii. The purpose of standard diagnosis code sets is to use a universal terminology in describing patients with certain conditions to determine compensable or non-compensable claims.

3. CMS primarily utilizes two systems of classification: (1) International Classification of Diseases ("ICD-9" and "ICD-10") medical diagnosis codes; and (2) Current Procedural Terminology ("CPT-4") procedure codes. *See* 45 C.F.R. § 162.1002.

---

[49] American Academy of Professional Coders (AAPC), https://www.aapc.com/resources/medical-coding/hcpcs.aspx.

**APPENDIX 2**

**Assignments**

**AvMed, Inc.**

1.      On June 26, 2019, AvMed, Inc. ("AvMed") irrevocably assigned to Series 17-03-615, a designated series of MSPRC, all rights under the MSP Act to recover against any liable primary payer (including Defendants) accident-related payments made on behalf of its Enrollees (the "AvMed Assignment"). The AvMed Assignment expressly provides, in pertinent part:

> Assignor irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its designated series, successors and assigns, any and all of Assignor's right, title, ownership and interest in and to (i) all Claims existing on the date hereof, whether based in contract, tort or statutory right, and all related recovery rights arising from and related to the claims data transferred to MSP Recovery (or its affiliates or service providers, including MSP Recovery, LLC), and (ii) any and all causes of action, claims and demands of any nature whatsoever relating to payments for health care services provided to Assignor's members and enrollees, and legal or equitable rights (including, but not limited to, subrogation) to pursue and/or recover monies related to the Claims that Assignor had, may have had, or has asserted against any party in connection with the Claims; and (iii) all causes of action, claims, rights and demands of any nature whatsoever, legal or equitable, against primary payers, Responsible Parties and/or third parties that may be liable to Assignor arising from or relating to the Claims, including claims under consumer protection statutes and laws (all of the items set forth in (i)-(iii), the "Assigned Claims") . . . . The assignment of the Assigned Claims set forth herein is irrevocable and absolute.

AvMed Assignment at § 1.1.1.

2.      The "Assigned Claims" exclude claims against "[AvMed's] network healthcare providers and current and former members" as well as "[c]laims arising from and related to the GlaxoSmithKline's manufacturing facility in Cidra, Puerto Rico[.]" Defendants are not AvMed "network healthcare provider[s]" or "current [or] former member[s]" and the claims at issue in this action do not relate to "GlaxoSmithKline's manufacturing facility in Cidra, Puerto Rico."

3.      To confirm that Enrollees were not one of the Excluded Claims, MSPRC reviewed

all carve-out lists provided by AvMed with its claims data. The carve-out lists were provided by AvMed to identify the Excluded Claims (i.e., the specific claims of Enrollees excluded from being pursued by MSPRC). Enrollees' claims are not included on AvMed's carve-out lists. Therefore, Enrollees' claims are not Excluded Claims under the AvMed Assignment.

4.     The AvMed Assignment also provided for a due diligence period wherein the Parties would exchange deliverables and enter into a separate "Stand-Alone Assignment Agreement" further evidencing the AvMed Assignment. Upon completion of the due diligence period and satisfaction of the various deliverables and agreed upon conditions, the Parties finalized the transaction, including exchanging compensation and executing the Stand-Alone Assignment Agreement.

5.     Consideration was given between each party in executing the AvMed Assignment.

**ConnectiCare, Inc.**

6.     On March 20, 2018, ConnectiCare, Inc. ("ConnectiCare") irrevocably assigned MSP Recovery, LLC  and Series 15-09-157, a designated series of MSPRC, all its rights under the MSP Act to recover against any liable primary payer (including Defendants) for accident-related payments made on behalf of its Enrollees (the "ConnectiCare Assignment"). The ConnectiCare Assignment expressly provides, in pertinent part:

> Assignor hereby irrevocably assigns, transfers, conveys, sets over and delivers to Assignee, and any of its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to all Assigned Medicare Recovery Claims, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party in connection with the Assigned Medicare Recovery Claims and all rights and claims against primary payers and/or, subject to the definition of Assigned Medicare Recovery Claims, third parties that may be liable to Assignor arising from or relating to the Assigned Medicare Recovery Claims, including claims under consumer protection statutes and laws, and all information relating thereto, as may be applicable.

> The transfer, grant, right, or assignment of any and all of Assignor's right, title, ownership, interest and entitlements in and to the Assigned Medicare Recovery Claims shall remain the confidential and exclusive property of Assignee or its assigns. This assignment is irrevocable and absolute.

ConnectiCare Assignment at § 2.

7.     The Assigned Medicare Recovery Claims include all Medicare Recovery Claims "related to Medicare Health Care Services that were rendered and paid for by [ConnectiCare] during the six (6) year period beginning September 29, 2011 and ending September 29, 2017" and exclude only claims that "can be asserted against Assignor's members, enrollees and/or contracted providers" and claims which, as of March 20, 2018, "have been assigned to and/or are being pursued by other recovery vendors."

8.     The exemplar ConnectiCare claims have been assigned to MSPRC and relate to Medicare healthcare services rendered and paid for by ConnectiCare between September 29, 2017 and September 29, 2017, they cannot be asserted against Connecticare's members, enrollees, and/or contracted providers, and, as of March 20, 2018, they were not assigned to and/or being pursued by other recovery vendors.

9.     On April 4, 2018, MSP Recovery, LLC assigned the rights it had acquired in the ConnectiCare Assignment to Series 15-09-157, a designated series of MSPRC (the "ConnectiCare Series Assignment"). The ConnectiCare Series Assignment, which was ratified and approved by ConnectiCare, states:

> MSP Recovery, LLC ("Assignor") … hereby irrevocably assigns, sells, transfers, conveys, sets over and delivers to **Series 15-09-157, a designated series of MSP Recovery Claims, Series LLC,** a Delaware series limited liability company ("Assignee"), and its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to all assigned Subject Medicare Recovery Claims, … as such terms may be defined in the [ConnectiCare Assignment.]

ConnectiCare Series Assignment at p. 1.

10.     Consideration was given between the parties in executing the ConnectiCare Assignment and the ConnectiCare Series Assignment.

**Preferred Medical Plan, Inc.**

11.     Plaintiff MAO-MSO has been irrevocably assigned any and all rights to recover payments made on behalf of its Assignor's Enrollees. This assignment authorizes MAO-MSO to pursue and enforce all legal rights of recovery and reimbursement for health care services and Medicare benefits. MAO-MSO alleges the assignment below to demonstrate MAO-MSO's standing.

12.     By agreement dated May 3, 2016, **Preferred Medical Plan, Inc. ("PMPI")** irrevocably assigned to MSP Recovery, LLC all of its rights under the MSP Act to recover against any liable primary payer (including Defendants) accident-related payments made on behalf of its Enrollees ("PMPI Assignment"). The PMPI Assignment expressly provides, in pertinent part:

> [PMPI] hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of [PMPI]'s right, title, ownership and interest in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies for [PMPI] that [PMPI] had, may have had, or has asserted against any party in connection with the Claims and all rights and claims against primary payers and/or third parties that may be liable to [PMPI] arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the "Assigned Claims[.]"

PMPI Assignment at § 3.1.

13.     On August 8, 2016, MSP Recovery, LLC assigned the rights it had acquired in the PMPI Assignment to Series PMPI, a designated series of MAO-MSO ("Series Assignment"). The Series Assignment states:

> Assignor hereby irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, all of Assignor's right, title, ownership and interest in and to all Assigned Claims, plus all proceeds, products and distributions of any kind, and proceeds of proceeds, in respect thereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party in connection with the Assigned Claims,

and all rights and claims against primary payers and/or third parties that may be liable to Assignor arising from or relating to the Assigned Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the "**Assigned Claims**."

Series Assignment at § 1.1.

**Health First Health Plans, Inc.**

14.    Effective April 28, 2016, **Health First Health Plans, Inc. ("HFHP")**, a Medicare Advantage Organization, irrevocably assigned to MSP Recovery, LLC all rights under the MSP Act to recover against any liable primary payer (including Defendants) accident-related payments made on behalf of its Enrollees ("HFHP Assignment"). The HFHP Assignment expressly provides, in pertinent part:

> Client hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of Client's right, title, ownership and interest in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies for Client that Client had, may have had, or has asserted against any party in connection with the Claims and all rights and claims against primary payers and/or third parties that may be liable to Client arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the "Assigned Claims".
>
> …
>
> The transfer, grant, right, or assignment of any and all of Client's right, title, ownership, interest and entitlements in and to the Assigned Claims shall remain the confidential and exclusive property of MSP Recovery or its assigns. This assignment is irrevocable and absolute.

HFHP Assignment at § 4.1.

15.    Effective June 12, 2017, MSP Recovery, LLC assigned all rights acquired under the HFHP Assignment to Series 16-05-456, a designated series of MSPRC ("Series 16-05-456 Assignment"). The Series 16-05-456 Assignment states:

> [T]he undersigned Assignor . . . irrevocably assigns, sells, transfers, conveys, sets

over and delivers to Assignee and its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to the Claims and Assigned Claims, (and all proceeds and products thereof, including any related assigned assets and assigned documents) as such terms are defined or contained in that certain (1) Assignment and (2) Addendum to the Recovery Agreement and Assignment Addendum, both given and effective April 28, 2016 and executed on June 1, 2018, by and between **Health First Health Plans, Inc.**, a Florida corporation and Medicare Advantage Organization and party to contract number H1099 with The Centers for Medicare & Medicaid Services, as the "Client" and health plan assignor, and **MSP Recovery, LLC**, a Florida limited liability company (the "Assignment"); irrespective of when the claims were vested in Client, inclusive of any and all claim(s), causes of actions, proceeds, products and distributions of any kind, and proceeds of proceeds, in respect thereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party pursuant to the Assignment from the Client, including claims under consumer protection statutes and laws, any and all rights and claims against primary payers and/or third parties that may be liable to Client arising from or relating to the Claims and all information relating thereto.

Series 16-05-456 Assignment at p. 1.

16.     On October 22, 2020, Series 16-05-456 irrevocably assigned all the rights it acquired from MSP Recovery, LLC to Series 44-20-456, a designated series of Series 44 ("Series 44-20-456 Assignment"):

Assignor . . . hereby irrevocably assigns, transfers, conveys, sets over, and delivers to Assignee and its successors and assigns, (i) any and all of Assignor's right, title, ownership, and interest in and to the [Assigned Claims], as well as (ii) the "Claims" and "Assigned Claims", and all proceeds and products thereof (collectively the "Assigned Claims") as such terms are defined in the Agreements.

Series 44-20-456 Assignment at p. 1.

17.     Consideration was given between each party in executing the HFHP Assignment, the Series 16-05-456 Assignment, and the Series 44-20-456 Assignment.

**Intermerican Medical Center Group, LLC**

18.     On December 16, 2014, **Interamerican Medical Center Group, LLC ("IMC")** irrevocably assigned to MSP Recovery, LLC all of its rights under the MSP Act to recover against

any liable primary payer (including Defendants) for accident-related payments made on behalf of

its Enrollees ("IMC Assignment"). Specifically, the IMC Assignment states:

> "By way of this Agreement, [IMC] appoints, directs, and, otherwise, irrevocably assigns all of [IMC's] rights as it pertains to the rights pursuant to any plan, State or Federal statute(s) whatsoever directly and/or indirectly for any of its members and/or plan participants, and/or its rights pursuant to any agreement[.]

IMC Assignment at § 1.1.

19.    On February 20, 2015, MSP Recovery, LLC irrevocably assigned all rights

acquired under the IMC Assignment to MSPAC ("MSPAC Assignment"):

> Assignor hereby irrevocably assigns, transfers, conveys, sets over, and delivers to Assignee or its assigns any and all of Assignor's right, title, ownership and interest in and to all rights and entitlements, that Assignor has, may have had, or has asserted against third parties from or relating to the Claims [assigned pursuant to the IMC Assignment].

MSPAC Assignment at p. 1.

20.    IMC consented to, acknowledged, approved, and ratified the MSPAC Assignment.

21.    Consideration was given between each party in executing the IMC Assignment and

MSPAC Assignment.